**VIBRANT SALES, INC.,**
**Plaintiff-Appellee,**

v.

**The NEW BODY BOUTIQUE, INC., Maximum Exposure Advertising Inc., Harvey S. Fishman and Avram C. Freedberg, Defendants-Appellants.**

**No. 744, Docket 80–7877.**

United States Court of Appeals,
Second Circuit.

Argued March 30, 1981.

Decided June 29, 1981.

George B. Yankwitt, Esq., New York City (Floran L. Fink, Mark J. Sugarman, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, of counsel), for defendants-appellants.

Jacob W. Heller, New York City (Richard F. Horowitz, Heller, Horowitz & Feit, P.C., New York City, of counsel), for plaintiff-appellee.

Before WATERMAN and MANSFIELD, Circuit Judges, and B. NEWMAN, Judge.*

MANSFIELD, Circuit Judge:

In this action for unfair competition and breach of contract defendants The New Body Boutique, Inc., Maximum Exposure Advertising Inc. ("MEA"), Harvey S. Fishman, and Avram C. Freedberg appeal from a decision of the District Court for the Southern District of New York, entered by Judge Morris E. Lasker after a non-jury trial, holding that defendants, by selling a waist-reducing belt called "Shrink Wrap" in competition with a similar belt already being marketed by plaintiff Vibrant Sales, Inc. ("Vibrant"), under the name "Waist Away," violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[1] and breached an agree-

---

* Of the U.S. Court of International Trade, sitting by designation.

1. "Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged

ment between Vibrant and defendants Fishman and Freedberg (MEA's assignees), entitling Vibrant to permanent injunctive relief.

We reverse. Since Vibrant's Lanham Act claim alleged that defendants' actions amounted to a false designation of origin, a violation could only have been made out if it had been shown that Vibrant's "Waist Away" belt (which defendants allegedly copied) had acquired secondary meaning and that the features allegedly copied were non-functional in nature. No such finding was or could have been made. The district court's decision on the Lanham Act allegation was therefore incorrect. The district court also erred in its interpretation of the agreement on which Vibrant's contract claim was based.

In late 1978 or early 1979, Isaac Bikel, Vibrant's principal owner, began marketing a waist-reducing belt called "Waist Away" on a limited scale. This original belt, which was never patented or trademarked, consisted of a strip of thick black rubber which could be fastened around the waist by the use of a set of Velcro fasteners. In order to increase sales, Vibrant entered into a joint venture agreement with MEA on September 4, 1979. Under the terms of that agreement, MEA was to market Vibrant's Waist Away belt nationwide.

By the end of 1979 the joint venture was enjoying considerable success as a result of MEA's extensive advertising campaigns.[2] Despite this prosperity, the joint venturers had a falling out early in 1980 and determined to end their relationship. After extensive negotiations in which both sides were represented by counsel, a "Termination Agreement" ("Agreement") was executed which provided that MEA's assignees, Fishman and Freedberg, should relinquish their half interest in the joint venture to Vibrant for the sum of $1,250,000 cash, the greater part of which represented sales already consummated but not yet accounted for to the joint venturers. The Agreement contained a clause which defined MEA's continuing right to compete in the waist-reducing belt market in the future (the "freedom-to-compete" clause):

"Sellers, MEA and any organization or other entity organized by Sellers, shall be free, without restriction or claim by the Purchaser, to sell, advertise, market, manufacture, distribute or promote, by mail order or otherwise, . . . a reducing belt or other similar or related products, except that:

"(a) the name 'Waist-Away' shall not be used in any advertisement to describe any product, except as may otherwise be authorized herein;

"(b) The name 'Vibrant' and 'Vibrant Sales' shall not be used, except as may be authorized herein;

"(c) *The likeness of the persons depicted in the advertisement annexed hereto as Exhibit B shall not be used*;

"(d) *A belt identical in all respects to the Waist-Away Belt currently being shipped by Purchaser shall not be marketed or manufactured by Sellers or MEA.* For this purpose the parties hereto agree that *belts differing in any respect whatever*, including, but not limited to different fastening system, a different texture, dimensions, or otherwise differing in any respect whatever, *shall not be deemed to be an identical product.*" (Emphasis supplied).

Soon after the Agreement was executed, defendants Fishman and Freedberg began marketing their own waist-reducing belt through a company called The New Body Boutique, Inc. The belt was called "Shrink Wrap," and was similar to the all-black belt marketed prior to the joint venture by Isaac Bikel. In response, Vibrant filed this suit on May 28, 1980.

The complaint, invoking § 43(a) of the Lanham Act, and New York common law,

---

by the use of any such false description or representation."

**2.** It is important to note, however, that the belt *primarily being marketed by the joint venture* was not the original all-black belt that Mr. Bikel had first developed. It was instead a cheaper belt made of distinctly thinner rubber covered on one side with blue nylon.

alleges that plaintiff's "Waist Away" belt is original and unique; that it has "come to be associated by the consuming public with plaintiff as the source of origin of said belt"; that defendants' advertisements picture a belt identical to that marketed by plaintiff, representing an attempt "wrongfully to pass off as theirs" the belt sold by plaintiff; that defendants' conduct is likely to cause confusion, mistake and deception as to "the source of origin of the belts being advertised by defendants"; and that defendants' purpose is "to induce the purchasing public to believe that defendants' products are the original", with a view of "trading upon plaintiff's good will and reputation and of passing off plaintiff's [sic] products as and for the products of defendants [sic]". This conduct is alleged to constitute a false designation of origin and a false description and representation of the product offered for sale, in violation of § 43(a). Additional claims alleged that defendants' conduct breaches the Agreement, violates § 368(d) of the N.Y. General Business Law, and constitutes fraud. (The last two claims are not before us on this appeal.) Plaintiff seeks compensatory and punitive damages and injunctive relief.

The district court, finding for the plaintiff on both the Lanham Act and breach of contract claims, concluded that defendants had "violated the Lanham Act . . . by advertising Shrink Wrap in a manner which falsely designates its origin." The court's finding on this point was based on several facts: (a) defendants on one occasion "used a photograph of plaintiff's belt in defendants' advertisement with the result that the advertisement has actually confused and is likely to continue to confuse the public as to the source of origin of defendants' belt"; (b) "[t]he appearance of the models in the defendants' ads is also of such striking similarity to that of the appearance in the plaintiff's ads to create a likelihood of confusing the public as to the origin of the designation of the products respectively advertised"; (c) letters from customers showed that some members of the public were actually confused about the origin of the two belts; and (d) while the all-black belt being sold by defendants was not identical in all respects to the blue belt primarily being sold by plaintiff, the differences were not visible in magazine advertisements, and in any case "there is no proof, nor even a contention that the color [or materials used] has any functional significance."

Turning to the breach of contract claim, the district court held that defendants had breached the Agreement in two respects. First, it found that defendant had marketed "[a] belt identical in all respects to the Waist-Away Belt currently being shipped by Purchaser", since the all-black belt did not differ in any material way from the blue belt. The court rejected defendants' argument that the language of the Agreement should be read literally on this point, because that would have the effect, in the court's opinion of "repeal[ing] *pro tanto* the public's right under the Lanham Act to be protected against false designation of origin", and because such a reading would totally eliminate "a right of protection" which the contract had been designed to confer on Vibrant.

Second, the court found that defendants had also breached the Agreement by using in their advertisements photographs of models who were similar in appearance to those used by plaintiff. The court held that the language of the Agreement prohibiting defendants from using "the likeness of the persons depicted in [plaintiff's] advertisements" did not mean that defendants were free to use any models other than those used in plaintiff's ads, but instead ruled out the use of "any persons who substantially resemble the models appearing in the Vibrant photograph." It found support for its conclusion on this point both in the language of the Agreement itself, and in the fact that any other reading would reduce the level of protection conferred by the Agreement on plaintiff while increasing the chances of confusion as to source of origin which § 43(a) was designed to prohibit.

By order dated October 9, 1980, Judge Lasker granted Vibrant broad permanent injunctive relief "without prejudice to

plaintiff's other rights and remedies"; defendants appeal.

## DISCUSSION

Section 43(a) of the Lanham Act contains two separate prohibitions: one against false designation of origin, and another against false description or representation. See Comment, *The Present Scope of Recovery for Unfair Competition Violations Under Section 43(a) of the Lanham Act*, 58 Neb.L. Rev. 159, 161 (1978). An action like the present one, which is predicated almost entirely on the false designation of origin leg of § 43(a), can only succeed if the features allegedly copied have acquired secondary meaning in the marketplace and are non-functional.[3] See, e. g., *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir. 1979); *Ives Laboratories, Inc. v. Darby Drug Co.*, 601 F.2d 631 (2d Cir. 1979), *on remand*, 488 F.Supp. 394 (E.D.N.Y.1980), *rev'd on other grounds*, 638 F.2d 538 (2d Cir. 1981); *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1215 (8th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).

The requirement of proof of secondary meaning flows logically from § 43(a)'s somewhat anomalous position in the Lanham Act. As the only provision in the Act which is not limited to registered marks, 43(a) may be invoked by claimants whose unregistered marks do not possess the presumptive source association of a registered trademark. See Comment, *Generic Drug Laws and Unfair Competition Claims Under the Lanham Act—An Uneasy Alliance: Ives Laboratories, Inc. v. Darby Drug Co.*, 33 Rut.L.Rev. 227, 237 (1980). As a result, a claimant suing under 43(a) is routinely required to show secondary meaning in order to convince the court that the defendant's copying has had the effect of communicating a "*false* designation of origin". As one observer has written:

"Unless the public has come to know a particular mark as indicating a particular source of origin, a finding of the requisite falsity would be anomalous since there would be no standard against which to measure such falsity." Germain, *Unfair Trade Practices Under Section 43(a) of the Lanham Act: You've Come a Long Way, Baby—Too Far, Maybe?*, 49 Ind.L.J. 84, 103 (1973).

The additional requirement that copied features must be non-functional if the copying is to come within the prohibition of § 43(a) reflects the concern that first-comers not be allowed to prevent the widespread use of useful but non-patentable features. As one commentator has put it:

"The doctrine of functionality is intended to permit the general use of features having value independent of identification; and the functionality of the copied feature supplies an explanation for the copying other than merely trading on the plaintiff's goodwill." *Developments in the Law—Competitive Torts*, 77 Harv.L. Rev. 888, 918 (1964).

When combined, the requirements of secondary meaning and non-functionality serve the salutary purpose of limiting § 43(a) claims to those situations in which unique or distinctive identifying features

---

**3.** Throughout this action, plaintiff has placed its reliance on the false designation of origin leg of § 43(a), where the requirements of secondary meaning and non-functionality clearly exist. However, even if the action had been pursued as one for false description or representation (where admittedly the concepts of secondary meaning and non-functionality are not relevant) plaintiff could not have succeeded. None of the allegations in plaintiff's complaint which could have been read as applying to a false description or representation case would lead to relief. Paragraphs 29, 34, and 35, which essentially allege that defendants' ads "wrongfully, unfairly and deceptively admonish[ed]

the public: 'Don't be fooled by look-alikes that deliver less' " would not be helpful to plaintiff, because disparagement of another's product is not cognizable under § 43(a). See, e. g., *Bernard Food Industries, Inc. v. Dietene Co.*, 415 F.2d 1279 (7th Cir. 1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970). Paragraph 36, which complains that defendants' actions diluted the value of plaintiff's reputation and good will, would also not have supported plaintiff's Lanham Act claim, because it was undisputed at trial that defendant's product was at least as good as any belt sold by plaintiff.

associated with a single manufacturer are being copied.

The district court, apparently laboring in the belief that evidence of mere confusion was sufficient to justify invoking § 43(a) to support a claim of false designation of origin with respect to a product having no registered mark, overlooked or ignored the requirements of secondary meaning and non-functionality. Such a reading is incorrect and would confuse § 43(a) with § 32 of the same Act. 15 U.S.C. § 1114. The latter section, which provides the basic remedy for one whose registered mark has been copied, explicitly allows recovery based on copying which "is likely to cause confusion." By contrast, § 43(a) at not point employs the language "likely to cause confusion", and the relevant case law does not incorporate that test by analogy. See, e. g., *Universal City Studios, Inc. v. Sony Corp.*, 429 F.Supp. 407, 409 (C.D.Cal.1977) (false representation context). The reason for the difference in treatment is clear: registered marks are presumed to represent the source in the minds of the public, whereas unregistered marks are not, absent a showing of secondary meaning.

When the proper standards for judging a § 43(a) claim are applied to the facts of this case, it is clear that plaintiff cannot prevail. Since plaintiff concededly made no attempt to adduce any evidence that its product's appearance or methods of advertising had acquired secondary meaning, its Lanham Act claim should have been dismissed. While it is therefore unnecessary for us to go on to the question of functionality, we are persuaded that plaintiff's claim should have been dismissed on that ground as well. All of the design elements cited by plaintiff as making its product unique (the particular rubber used, the Velcro fastener, the graduated sizes, the belt's alleged reversibility, and the "distinctive 3 box configuration on the front" produced by the stitching which attaches the Velcro strips to the belt) are functional and therefore subject to copying. None of the features mentioned could properly be classified as "a mere arbitrary embellishment

... adopted for purposes of identification and individuality," *Pagliero v. Wallace China Co.*, 198 F.2d 339, 343 (9th Cir. 1952). They are therefore beyond the scope of the protection which § 43(a) affords.

On this appeal plaintiff argues that since the district court found that defendants used a photograph of plaintiff's belt in one of their ads it must prevail on its § 43(a) claim, because "[i]t is by now hornbook law that Section 43(a) is violated when a party attempts to market a product by use of a photograph of the product of another." Although such conduct may give rise to liability, it is not automatic. One who uses a photograph of his competitor's unpatented and untrademarked product to advertise his own wares may be guilty of false representation if the product pictured is not identical to the one he is prepared to deliver. This was central to the Third Circuit's seminal decision in *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir. 1954), where the defendant made use of a picture of the plaintiff's $17.95 dress to advertise its own inferior $6.95 dress. Second, he may be vulnerable to a charge of false designation of origin if the features pictured in the photograph are non-functional and have acquired the secondary meaning necessary to indicate origin to the typical consumer. See, e. g., *Crossbow, Inc. v. Dan-Dee Imports, Inc.*, 266 F.Supp. 335 (S.D.N.Y.1967), where the defendant carefully copied the plaintiff's popular signal light and, because of its distinctively novel design, its copies were widely believed to have been made by the same manufacturer as the heavily advertised original.

On the facts of this case, defendants cannot be said to have committed either sin. Unlike the dressmaker in *L'Aiglon*, defendants admittedly shipped exactly what they depicted in their ads. See *Mastro Plastics Corp. v. Emenee Industries, Inc.*, 16 A.D.2d 420, 228 N.Y.S.2d 514 (1st Dep't 1962); *George O'Day Associates, Inc. v. Talman Corp.*, 206 F.Supp. 297 (D.R.I.), aff'd, 310 F.2d 623 (1st Cir. 1962), cert. denied, 372 U.S. 977, 83 S.Ct. 1112, 10 L.Ed.2d 142 (1963). And, unlike the copier of novelty

lights in *Crossbow*, defendants are not trading improperly on an existing market impression that its goods are actually those manufactured by plaintiff, because there was no showing of secondary meaning here. Although some customers may have believed that defendant's product came from the same source as that of plaintiff, they did so not because of any distinctive, unique or non-functional mark or feature but because plaintiff's functional product was the only one with which they were acquainted, due undoubtedly to plaintiff's advertising. This is not enough to entitle plaintiff to relief under § 43(a) of the Lanham Act. As Judge Bartels recently noted in *L & L White Metal Casting Corp. v. Joseph*, 387 F.Supp. 1349, 1356 (E.D.N.Y.1975):

> "In order for the plaintiff to succeed in its claim under [§ 43(a)], it must show that the casting depicted in the photograph is so distinctively associated with the plaintiff that it operates much in the manner of a trademark and that the use of the photograph is likely to result in deception or confusion as to the representation or origin of the goods sold."

To the extent that some of the language in *Matsushita Electric Corp. v. Solar Sound Systems, Inc.*, 381 F.Supp. 64 (S.D.N.Y. 1974), can be read to look the other way, we do not choose to approve it. We also note that there, as in *L'Aiglon*, the copied product was inferior to the original, which is not the case here.

■ We next move to plaintiff's breach of contract claim, which turns on the interpretation to be given to the earlier-quoted provisions of the Termination Agreement.

At the outset, since defendants did not violate the Lanham Act by selling a belt which consumers might have difficulty distinguishing from plaintiff's original belt, the court's concern that a straightforward interpretation of the Agreement would repeal *pro tanto* "the public's right under the Lanham Act to be protected against false designation of origin" is unfounded. When the Agreement is examined within its four corners, free from any concern that Lanham Act protection must be "saved", the lower court's reading becomes untenable. The Agreement clearly grants to defendants the right to market a waist-reducing belt in the future as long as it is not "identical in all respects" with the Waist Away being shipped on March 31, 1980.[4]

Even a casual examination of the two belts demonstrates that they are not identical in all respects, and in fact differ substantially in appearance, texture, and construction. No persuasive reason is offered for reading the plain language of the Agreement differently. Judge Lasker's contrary result was based in part on his concern that plaintiff not be left without any protection at all against future competition from defendants, since "[t]he contract clearly purports to confer a right of protection on Vibrant." Here we must disagree. There is no evidence that the freedom-to-compete clause was designed only to protect Vibrant.[5] On the contrary, the text of the Agreement, negotiated at arm's length by counsel, was intended to confer benefits on both sides, with the freedom-to-compete clause being aimed at protecting the defendants' future rights at least as much, if

---

4. Plaintiff argues on appeal that this provision of the Agreement was intended by the parties to cover both its blue belt and its original all-black belt. We see no reason to disturb the district court's factual finding that it was the blue belt which was "primarily" being shipped by plaintiff at the time of the Agreement. Since the Agreement specifically referred to "the" Waist Away Belt, it is hard to see how two belts could have been included within its coverage. We therefore conclude that the "identical in all respects" test should be applied to the blue belt and defendants' black belt, and that the original black belt was not within the contemplation of this portion of the Agreement.

5. Plaintiff appears to argue on appeal that the key provisions of the Agreement should be read favorably to it because it was coerced into signing the Agreement. The argument is frivolous. Plaintiff's principal, Mr. Bikel, is hardly a business neophyte. He was represented by counsel throughout the negotiations which led to the Agreement. In any case plaintiff's remedy, if it thinks it was coerced into signing, is not enforcement after creative rewriting, but avoidance. 1 Corbin on Contracts § 6 at 12 & n.6 (1963). Absent a request to avoid, we decline to consider the argument further.

not more so, then those of Vibrant. Although Vibrant was obligated under the Agreement to pay defendants a substantial sum ($1,250,000), in return it was acquiring defendants' half-interest in the joint venture, whose impressive sales made up to March 1980 but not yet accounted for indicated that the Agreement was more in the nature of a settlement of past accounts than an effort to preclude future competition on defendant's part. There is therefore no reason why the plain language of the freedom-to-compete provision should be twisted out of shape in an effort to reach the court's concept of an "equitable" result.

Finally, we reject the district court's reading of the freedom-to-compete provision as barring defendants' use of models similar in appearance to those used by plaintiff. With all respect, we have difficulty seeing how the clause

> "The likeness of the persons depicted in the advertisement annexed hereto as Exhibit B shall not be used"

can be read to apply to persons other than those depicted in Exhibit B. In any case, our reading finds strong independent support in defendants' uncontested assertion that during the negotiations leading up to the signing of the Agreement a request was made that photographs depicting additional couples be added to the one already included in Exhibit B, and that the request was rejected. In the light of all these circumstances, we are convinced that defendants' use of a photograph depicting a couple similar in appearance to the one used by plaintiff did not breach the Agreement.

The order of the district court is reversed.