**WARNER BROS. INC.,**
**Plaintiff-Appellee,**

v.

**GAY TOYS, INC., Defendant-Appellant.**

**No. 161, Docket 83–7365.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 26, 1983.
Decided Dec. 21, 1983.

---

**6.** *See Friarton Estates,* 681 F.2d at 161; *CES Publishing Corp. v. St. Regis Publications, Inc.,* 531 F.2d 11, 15 (2d Cir.1975).

Robert G. Mentag, Detroit, Mich. (Milton Wolson, Bernard Malina, New York City, of counsel), for defendant-appellant.

Arthur J. Greenbaum, New York City (Carol F. Simkin, Louis S. Ederer, Jane Ginsburg, Cowan, Liebowitz & Latman, Michael I. Davis, Weiss, Dawid, Fross, Zelnick & Lehrman, New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, OAKES, and KEARSE, Circuit Judges.

OAKES, Circuit Judge:

This is the rather unusual case of an appeal from the grant of a final injunction after this court had directed the district court to enter a preliminary injunction. *Warner Bros. Inc. v. Gay Toys, Inc.,* 658 F.2d 76 (2d Cir.1981). On remand, the United States District Court for the Southern District of New York, Whitman Knapp, Judge, granted summary judgment for Warner Bros. Inc. (Warner), on its claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976), that the toy cars marketed by Gay Toys, Inc. (Gay Toys), and patterned after the "General Lee,"[1] an automobile featured in Warner's television series "The Dukes of Hazzard," tended to confuse purchasers as to their source or sponsorship. We affirm.

Our previous opinion held that (1) unregistered trademarks are protected under § 43(a), 658 F.2d at 77–78; (2) protection may extend to symbols associated with specific ingredients of successful television series such as the symbols which identify the "General Lee," *id.* at 78; (3) to obtain an injunction under § 43(a) only a likelihood of confusion as to source or sponsorship need be shown, *id.* at 79; and (4) Gay Toys' use of the "General Lee" symbols created a likelihood of confusion as to the source or sponsorship of the toy cars, *id.* at 78, 79. We rejected Gay Toys' argument that for likelihood of confusion to exist it was necessary that Warner be the manufacturer of the real "General Lee" toy car. *Id.* at 79.[2]

On remand the district court, after questioning the applicability of the Lanham Act in the first instance, 553 F.Supp. 1018 at 1019, said that our opinion "conclusively presumed" both the desire of Warner's audience for officially sponsored toys and the deliberate creation by Gay Toys of sufficient confusion to invoke the Act. *Id.* at 1020. The court, then, assumed that the consumers' motivation in desiring to buy officially sponsored toys was somehow relevant in establishing the requisite secondary meaning to show identification with a source. It concluded that in our earlier opinion we "presumed" that consumers' de-

1. Warner's "General Lee" is an imitation 1969 Dodge Charger of bright orange color with a Confederate flag emblem on the car roof and the numerals "01" placed on the door. Gay Toys' imitations, made after failure to obtain a license from Warner, while taking various forms and bearing a different name, usually had the same emblems except for a reversal of the numbers to "10." Upon complaint from Gay Toys' customers that the numerals were incorrect, Gay Toys would send them labels of a "1" and a "0," informing the customer to affix the numbers as he saw fit.

2. The district court had previously held that Warner's failure to have a reputation as a toy car maker was relevant. *Warner Bros. Inc. v. Gay Toys, Inc.,* 513 F.Supp. 1066, 1069 (S.D.N.Y.1981).

sire for the "official" toy demonstrated this motivation. The court then rejected the defense that the design of the "General Lee" is "functional" insofar as the symbols are required to permit children to play "The Dukes of Hazzard" with the toy car. *Id.* at 1020–21. It also rejected defenses of abandonment and lack of clean hands. 553 F.Supp. at 1020–21.

On this appeal Gay Toys renews the argument of "functionality" made below. It further claims that because "consumer motivation" is a necessary element of secondary meaning required to show identification with a source, and proof of such was lacking here, the district court decision (and by implication, at least, our previous decision) was contrary to a long line of authority in this court.[3] Finally it argues that the district court erred in rejecting as a matter of law the defenses of lack of clean hands and abandonment by "naked licensing."

*Functionality*

■ Functional symbols (those that are essential to a product's use as opposed to those which merely identify it) are not protected under § 43(a), *see, e.g., Vibrant Sales, Inc. v. New Body Boutique, Inc.,* 652 F.2d 299, 303 (2d Cir.1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982). Gay Toys claims the "General Lee" symbols in question are functional in the sense that they are essential to enable children to play "Dukes of Hazzard" with the cars. This is a paradoxical argument, since it is precisely the fact that the symbols provide identification that make them "functional" in the sense urged on us by Gay Toys, while Warner's exclusive right to use its own identifying symbols is exactly what it seeks to protect. Carried to a logical conclusion, Gay Toys' argument would enlarge the functionality defense so as to eliminate any protection for any object,

since presumably each feature of any object is designed to serve a particular "function" in Gay Toys' sense of the term.

Warner's position is that functionality should be considered in terms of toy cars generally and not "Dukes of Hazzard" toy cars specifically, so that, for example, the use of wheels cannot be protected, but the Confederate flag marking coupled with the numerals, all on a bright orange background, can be. It cites *In re DC Comics,* 689 F.2d 1042, 1045 (Cust. & Pat.App.1982) (dolls generally and not Superman dolls are the class by which functionality is determined), and language of this court relying upon a law review note that identifies functional features as those "having value independent of identification." *Vibrant Sales, Inc.,* 652 F.2d at 303 (citing *Developments in the Law—Competitive Torts,* 77 Harv.L. Rev. 888, 918 (1964)).

Gay Toys relies primarily on a Ninth Circuit case which held that an identifying insignia of a fraternal organization is functional and nonprotectable as a trademark when used on jewelry, at least as long as no one is confused that the jewelry was made or licensed by the fraternity. *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 919 (9th Cir.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981). Though the decisions of various circuits are not uniform on this question, we agree with Warner both on grounds of logic and of policy.

While there has been some confusing language in the case law, particularly that linking what is functional to the commercially successful features of a product, *see In re DC Comics, Inc.,* 689 F.2d at 1045 (discussing cases), an examination of the roots and purposes of the functionality doctrine suggests coherent limits to its use. In *Singer Manufacturing Co. v. June Manufac-*

---

**3.** Our previous decision ordering the district court to issue a preliminary injunction referred without discussion to the "General Lee" symbols as "non-functional," 658 F.2d at 77, and addressed the question of likelihood of confusion as to source and sponsorship. That decision, however, does not foreclose consideration of the arguments Gay Toys makes on appeal from an order granting a final injunction. *See Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 742 (2d Cir.1953); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2950, at 494–96 (1973). *See also Imperial Chemical Industries Ltd. v. National Distillers & Chemical Corp.,* 354 F.2d 459, 463 (2d Cir.1965).

*turing Co.,* 163 U.S. 169, 184–85, 16 S.Ct. 1002, 1008, 41 L.Ed. 118 (1896), the Supreme Court held that the form, size, shape, and appearance of sewing machines once protected by various patents fell into the public domain upon expiration of the underlying patents. The shape or form necessary to the once patented features, even though distinctive and identifying, could be copied without competing unfairly.

Applying the teaching of *Singer* to an attempt to copy design features of an early version of the vacuum cleaner in an unfair competition suit, the Seventh Circuit said in *Pope Automatic Merchandising Co. v. McCrum-Howell Co.,* 191 F. 979, 981–82 (7th Cir.1911):

> Development in a useful art is ordinarily toward effectiveness of operation and simplicity of form. Carriages, bicycles, automobiles, and many other things from diversity have approached uniformity through the utilitarian impulse. If one manufacturer should make an advance in effectiveness of operation, or in simplicity of form, or in utility of color; and if that advance did not entitle him to a monopoly by means of a machine or a process or a product or a design patent; and if by means of unfair trade suits he could shut out other manufacturers who plainly intended to share in the benefits of the unpatented utilities and in the trade that had been built up thereon, but who used on their products conspicuous nameplates containing unmistakably distinct trade-names, trade-marks, and names and addresses of makers, and in relation to whose products no instance of deception had occurred—he would be given gratuitously a monopoly more effective than that of the unobtainable patent in the ratio of eternity to 17 years.

*See also Flagg Manufacturing Co. v. Holway,* 178 Mass. 83, 59 N.E. 667 (1901) (Holmes, C.J.) (holding design of zither not protectable: "In the absence of a patent the freedom of manufacture cannot be cut down under the name of preventing unfair competition.").

More recently courts have continued to understand the functionality defense as a way to protect useful design features from being monopolized. The Supreme Court, in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850–51 n. 10, 102 S.Ct. 2182, 2186–87 n. 10, 72 L.Ed.2d 606 (1982) (dictum), defined a functional feature as one that "is essential to the use or purpose of the article or [that] affects the cost or quality of the article." A design feature of a particular article is "essential" only if the feature is dictated by the functions to be performed; a feature that merely accommodates a useful function is not enough. *In re Morton-Norwich Products, Inc.,* 671 F.2d 1332, 1342 (Cust. & Pat.App. 1982) (shape of plastic container for spray products not essential to its purpose as a sprayer). And a design feature "affecting the cost or quality of an article" is one which permits the article to be manufactured at a lower cost, *e.g., Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 122, 59 S.Ct. 109, 115, 83 L.Ed. 73 (1938) (pillow shape of shredded wheat biscuit functional as cost would be increased and quality lessened by other form), or one which constitutes an improvement in the operation of the goods, *e.g., Fisher Stoves Inc. v. All Nighter Stove Works, Inc.,* 626 F.2d 193, 195 (1st Cir.1980) (two-tier design of woodstove functional because improving the operation of the stove in three respects).

 The functionality defense, then, was developed to protect advances in functional design from being monopolized.[4] It is designed to encourage competition and the broadest dissemination of useful design features. The question posed is whether by protecting the "General Lee" symbols we are creating an eternal monopoly on the shape or form of some useful object, thereby limiting the sharing of utilitarian refinements in useful objects.

---

4. The doctrine is analogous to the exception in the Copyright Act denying copyrightability as to the "mechanical or utilitarian aspects" of works of artistic craftsmanship. 17 U.S.C. § 101 (1976); 37 C.F.R. § 202.10 (1983); *see Kieselstein-Cord v. Accessories by Pearl, Inc.,* 632 F.2d 989 (2d Cir.1980); 1 M. Nimmer, *Copyright* § 2.08[B] at 2–87—2–96.4 (1983).

With the functionality defense thus defined it is obvious that the "General Lee" symbols—flag emblem and numbers in tandem with the color orange—are not the kind of "useful objects" that the functionality defense was designed to protect. Rather than representing an advance in the useful arts, the symbols merely function to enable consumers, especially children, to identify a toy car with a particular television series.

This conclusion, that only functions which represent development of useful features, and not functions which serve merely to identify, are considered in determining functionality, is reinforced by earlier as well as by our own recent case law. In *Moline Pressed Steel Co. v. Dayton Toy & Specialty Co.*, 30 F.2d 16 (6th Cir.1929), the court held that two toy manufacturers could each make identical toy dump trucks modeled after an actual truck, but that the one could not use the other's trade name of "Buddy-L" on the truck. It could use its own trade name "Sonny" which the court found neither in sound nor in appearance was "likely to be confused" with "Buddy-L." *Id.* at 18. Nor could the "Sonny" truck "use on its trucks any unique design or coloring, lacking functional utility, which has become identified with [the 'Buddy-L' truck]." *Id.* We have already referred to *Vibrant Sales, Inc. v. New Body Boutique, Inc.* (weight loss waistbelt design functional), which points out that "[t]he additional requirement that copied features must be non-functional if the copying is to come within the prohibition of § 43(a) reflects the concern that first-comers not be allowed to prevent the widespread use of useful but non-patentable features." 652 F.2d at 303. In *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir.1979), the court held that the design of the Dallas Cowboys cheerleaders' costume using "white boots, white shorts, blue blouse, and white star-studded vest and belt" "imparts a western flavor appropriate for a Texas cheerleading squad" but was "arbitrary" and worthy of trademark protection even though the uniform was otherwise functional. *Id.* at 203 n. 4, 204. The court there held that "the fact that an item serves or performs a function does not mean that it may not at the same time be capable of indicating sponsorship or origin, particularly where the decorative aspects of the item are nonfunctional." *Id.* at 204. So, too, with the "General Lee." Its distinctive markings indicate origin and go to appearance and dress; they are arbitrary and nonfunctional.

*Consumer Motivation*

Gay Toys' second principal argument concerns the issue of secondary meaning. To prove a violation of the false designation of origin prohibition in § 43(a) of the Lanham Act protecting unregistered trademarks, it is first necessary to prove that the mark in question has acquired a second meaning to the consumer primarily as a mark identifying the product with a particular source. *E.g., Vibrant Sales*, 652 F.2d at 303. Gay Toys claims that to show secondary meaning a trademark holder must show that consumers are motivated to buy the allegedly infringing goods in question because they believe the goods are sponsored or manufactured by a particular source identified by the trademark symbol in question. It was not proved that consumers of "General Lee" models care whether the goods are manufactured or sponsored by any single source, the district court found. Since Warner has not proved "consumer motivation," the argument runs, it has not shown "secondary meaning," and its infringement claim must fail.

We are referred to what is said to be "consumer motivation" language in a line of cases including *Crescent Tool Co. v. Kilborn & Bishop Co.*, 247 F. 299, 300 (2d Cir.1917) ("whether the public is moved in any degree to buy the article because of its source"); *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 697 (2d Cir.1961) ("To establish a secondary meaning . . . it must be shown that . . . purchasers are moved to buy it because of its source."); *Hygienic Specialties Co. v. H.G. Salzman, Inc.*, 302 F.2d 614, 620 (2d Cir.1962); *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir.1979) ("The

crucial question ... always is whether the public is moved in any degree to buy an article because of its source."), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980).

■ In each of these cases, however, the plaintiff failed to establish source association in the general sense of associating the term or symbol used by the defendant with the plaintiff. *Crescent Tool,* 247 F. at 300; *Blisscraft,* 294 F.2d at 697; *Hygienic Specialties,* 302 F.2d at 620; *American Footwear,* 609 F.2d at 660, 662. Here there *was* proof of association of the "General Lee" toy car with the "Dukes of Hazzard" television series. Nor is there any doubt that consumers wanted the toy in part because they (or their children) identified the toy with the television series. This is sufficient even though Warner is not a manufacturer of toy cars; it is sufficient though there was no showing that consumers believed that the toy cars marketed by Gay Toys were sponsored or authorized by Warner.

In a case for all practical purposes identical to ours, involving the very "General Lee" and another imitator, the Seventh Circuit recently said:

> [T]his court has previously noted that to establish secondary meaning it is not necessary for the public to be aware of the name of the manufacturer which produces a product ....
>
> [A]s a matter of law the capacity of the PPC "Rebel" or the "General Lee" cars to indicate the "Dukes of Hazzard" television show establishes the existence of secondary meaning in this case inasmuch as the toy cars are associated with a single source—the television series sponsored by Warner Bros. This follows even though Warner Bros., Inc. is not a manufacturer of toy cars.

*Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 856 (7th Cir.1982) (citations omitted).

What then of the consumer motivation language of the cases? Initially it should be noted that the language carries an ambiguous meaning. To say consumers are motivated to buy an article "because of its source" can mean either that, for example, customers buy it because they identify it with the television show, *or* that customers buy it because they believe the article is produced by or authorized by the television show makers. Most of the authority Gay Toys provides for its "consumer motivation" test, then, does not really demonstrate that the test has been applied in the restrictive manner Gay Toys urges upon us.

■ The "consumer motivation" language, moreover, may have some more specific application where there is a concern over the assertion of exclusive rights in the shape of useful objects, *see Hygienic Specialties,* 302 F.2d at 620 (dicta), or when the symbol in question generates a "generalized linkage" to a particular source, but the symbol's primary significance remains its independent aesthetic or utilitarian appeal.[5] *See, e.g., American Footwear,* 609 F.2d at 663.

■ The ultimate test for secondary meaning, however, as Judge Nies of the Court of Customs and Patent Appeals has pointed out, is simply whether the term, symbol or device identifies goods of "a *particular* source," in which case it is protectable. If it does not identify goods with a particular source, it is not protectable. *In re DC Comics, Inc.,* 689 F.2d at 1054 (concurring opinion). "[T]he reality," she adds, is that "the primary objective of purchasers is to obtain particular goods, not to seek out particular sources or producers, as such." *Id.* This is what "secondary meaning" means; the true inquiry is whether the primary function of a particular design is other than referential, leading to association in the public mind with no one or nothing, or, by virtue of its distinctiveness, it is designed to create an association with a

---

**5.** Since for a mark to acquire secondary meaning its *primary* significance to consumers must be its referential character, a mark that has some referential sense but whose primary purpose is independent of its source-identifying character has not acquired sufficient secondary meaning to warrant protection. *E.g., American Footwear,* 609 F.2d at 663.

single source. In making that inquiry, the actual motivation of purchasing consumers—whether they were motivated because of quality, source, feature, design, price, durability, prestige, or otherwise—is essentially irrelevant. *Id.* Different people, for example, buy Rolls Royce automobiles for different reasons including combinations of the above factors, but the distinctive overlapping "R's" symbol is nevertheless surely protectable. Irrespective of customers' motivations in making a purchase, they recognize and associate the symbol with the auto manufacturer.

The symbols on the "General Lee" just as clearly have a secondary meaning in the eyes of the consumer of the toy car. There was ample evidence—indeed Gay Toys' sales of its imitations are themselves proof—that the public did associate the "General Lee" with the "Dukes of Hazzard" television series. Its distinctive markings and color made it a "Dukes of Hazzard" car, or a toy depicting that car. It is *because* of that association, the identification of the toy car with its source, Warner's television series, that the toy car is bought by the public. That is enough.

*Abandonment and Unclean Hands*

 The abandonment and unclean hands defenses advanced by Gay Toys can be dealt with more quickly. The unclean hands defense is based on Warner's cease and desist letter to Gay Toys threatening criminal prosecution for copyright infringement, a claim not pressed in this suit. Warner did have copyright registration for the "Dukes of Hazzard" show, so that its claim would not be wholly baseless. In addition, as this court held in *Maatschappij Tot Exploitatie Van Rademaker's Koninklijke Cacao & Chocoladefadrieken v. Kosloff,* 45 F.2d 94, 96 (2d Cir.1930), the defense of unclean hands applies only with respect to the right in suit; making a false trademark claim there did not bar plaintiff from an unfair competition claim.

Dismissal of the abandonment defense was also proper. Even if we accord Gay Toys the most favorable inference, it has not met the "high burden of proof"

required to show abandonment through failure to police, at least in light of Warner's uncontroverted evidence of quality control standards which it enforced upon its licensees. *See United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 140 (3d Cir.1981).

In view of our determination of the principal issues, it is unnecessary to pass on Warner's claims that Gay Toys has violated the New York law of unfair competition.

Judgment affirmed.