**In re DC COMICS, INC.**

**Appeal No. 82–528.**

United States Court of Customs and Patent Appeals.

Sept. 30, 1982.

Serial No. 57,159, filed July 8, 1975, for toy doll figure, claiming first use on December 10, 1972:

Arthur J. Greenbaum, New York City, for applicant.

Joseph F. Nakamura, Sol., Fred E. McKelvey, Associate Sol., and Brian Anderson, Trademark Atty., Washington, D. C., for Patent and Trademark Office.

Before MARKEY, Chief Judge, RICH, BALDWIN, MILLER and NIES, Judges.

BALDWIN, Judge.

This is an appeal from the U.S. Patent and Trademark Office Trademark Trial and Appeal Board (board) decision sustaining the examiner's refusal of three applications by appellant for registration on the Principal Register.[1] *In re DC Comics,* 211 USPQ 834 (TTAB 1981). We reverse.

### Background

Appellant is a publisher of comic books detailing the fictional exploits of assorted "super heroes" and villains, and is also the producer or sponsor of products that are related in some way to these characters. Appellant now seeks to register particular drawings of three characters, Superman, Batman, and Joker, as trademarks for toy dolls.

The following application is representative:

1. The applications for registration are Serial Nos. 56,993, filed July 7, 1975, Serial No. 57,-

### Decision of the Board

The board sustained the rejection of appellant's applications on two grounds. First, the board concluded that the drawings in question "naturally and normally direct attention to the appearance and purpose of goods enclosed in the cartons" bearing the drawings, and are, therefore, "so *descriptive* that they are not trademarks." 211 USPQ at 837 (emphasis added). Second, the board found the drawings to be "artistic renditions of the dolls," sharing with the dolls the "commercially functional" features of "customary dress, accountrements and facial expression of the character(s)." 211 USPQ at 837. Accordingly, the board concluded that the drawings "are functional in a utilitarian sense and for that reason are not trademarks."

### The Issue

In its opinion, the board stated that: the fundamental question in these applications is whether an artistic rendition of a fictitious character *can serve as a trademark* for what is a somewhat cruder three-dimensional toy doll version of the same fictitious character.

211 USPQ at 836 (emphasis added). Accordingly, the issue before us now is whether the board correctly concluded that appellant's drawings cannot function as trade-

159, filed July 8, 1975, and Serial No. 94,029, filed July 20, 1976.

marks for toy dolls resembling Superman, Batman, or Joker, respectively.

## OPINION

### Descriptiveness

 Generally, a word or image is considered "descriptive" of a particular product when its use with that product conveys to one who is unfamiliar with the product its functions or qualities. *See In re American Society of Clinical Pathologists,* 58 CCPA 1240, 1243, 442 F.2d 1401, 1407, 169 USPQ 800, 801 (1971). Trademark law has traditionally imposed restrictions on the right to exclude others from using certain "descriptive" symbols to ensure that the opportunity for all to associate such symbols with their common referents remains unencumbered. However, the fact that a symbol may impart to the prospective purchaser information concerning the physical characteristics of goods with which it is used does not perforce render the symbol incapable of functioning as a trademark. *See, e.g., Minnesota Mining & Manufacturing Co. v. Johnson & Johnson,* 59 CCPA 971, 973, 454 F.2d 1179, 1180, 172 USPQ 491, 492 (1971) (the best trademarks are often highly suggestive of the advantageous characteristics of the goods). Indeed, § 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), provides that even a descriptive symbol may be registered as a trademark on the Principal Register if the symbol "has become distinctive of applicant's goods in commerce."

Nevertheless, the board upheld the examiner's refusal of appellant's applications for registration on the ground that appellant's drawings are *so* descriptive that they could not in any case serve as trademarks for appellant's goods. As supportive authority, the board cited Judge Rich's concurring

opinion in *In re Abcor Development Corp.,* 588 F.2d 811, 815, 200 USPQ 215, 219 (Cust. & Pat.App.1978). In *Abcor,* the question before the court was whether applicant's alleged mark (GASBADGE) was "merely descriptive" within the meaning of § 2(e)(1) of the Lanham Act, 15 U.S.C. 1052(e)(1). Since the issue in *Abcor* was not whether applicant's alleged mark could actually be a trademark for applicant's product, but rather whether the alleged mark was instead "merely descriptive" under § 2(e)(1), *Abcor* should provide no support for the board in this case. To the extent that the board read Judge Rich's concurrence as saying that all apt descriptive names cannot be trademarks for the items they describe, we are not persuaded to adopt the board's interpretation or its derivative proposition that, by analogy, a picture of a product necessarily cannot function as a trademark for that product.

Even if we adopt, arguendo, the board's view that appellant's drawings are pictorial representations of the toy dolls themselves,[2] we are not led *a priori* to conclude that the drawings are incapable of being trademarks as to the dolls. Whatever information a drawing of Superman or Batman or Joker might convey to the average prospective purchaser regarding a doll resembling one of the related fictional characters is wholly dependent on appellant's efforts to associate each character in the public's awareness with numerous attributes, including a single source of sponsorship. While a drawing of Superman on a box may tell a would-be buyer something about the actual appearance of a doll within, this information-conveying aspect of the drawing does not, as we have already noted, conclusively eliminate its possible trademark role.[3]

---

2. In fact, we feel the board erred in equating appellant's drawings of comic book personages with pictorial representations of toy doll figures modeled after those personages. This is not a case where the product itself, a picture of the product, or the configuration of the product is sought to be registered. Rather, appellant wishes to register stylized drawings of well-known characters, depicted in specific poses selected from a myriad of possible attitudes, as

indicators of origin for products sponsored by appellant.

3. The solicitor has argued the "appellant's Superman 'design' on a carton merely helps a purchaser determine what is being purchased." To the contrary, however, we conclude that such a "design" at most suggests only that the carton contains a doll, certain features of which recall the various characteristics associated with the character of Superman. A substantial

Moreover, appellant cannot be considered to have created a new product category, the rubric of which (for example, "Superman dolls") should remain available for all to employ in commerce, simply by having originated and promoted certain unique characters and products related to them. The registration of appellant's drawings as trademarks for toy dolls would not diminish the store of common words and visual representations which appellant's competitors and the general public alike may freely use. Hence, appellant would not be in a position to impair competition in the sale of toy doll figures, nor could it deprive the public of access to imagery associated with toy dolls generally or "super hero" or villain figures in particular.[4]

■ Therefore, we cannot agree with the board that appellant's drawings are descriptive of toy dolls to such an extent that they are incapable of functioning as trademarks for such dolls.

*Functionality*

In characterizing (erroneously, we believe) appellant's drawings as "artistic renditions of the dolls" themselves, the board found that the drawings incorporated certain "design features" of the dolls which are "functional in a utilitarian sense." 211 USPQ at 837. The board reasoned that the features in question were "indispensable elements of the commercial appeal of the product" and, therefore, were "commercially functional" facets of the dolls that could not be used to designate source. 211 USPQ at 837.

■ The board's rationale finds support in recent circuit court opinions which include within the category of "functional features" any aspect of a product that is "an important ingredient in the commercial success of the product." *Ives Laboratories v. Darby Drug Co.*, 601 F.2d 631, 643, 202 USPQ 548, 557 (CA2 1979) (quoting *Pagliero v. Wallace China Co.*, 198 F.2d 339, 343, 95 USPQ 45, 48 (CA9 1962)); *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1217–18, 191 USPQ 79, 85–86 (CA8), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). However, we consider such a broad definition to be at odds with this court's precedent in this area. *See, e.g., In re Penthouse International Ltd.*, 565 F.2d 679, 682–83, 195 USPQ 698, 700–01 (Cust. & Pat.App.1977). Moreover, the board's rationale obscures the distinction between utilitarian and aesthetic functionality. *See In re Morton-Norwich Products*, 671 F.2d 1332, 1338 n. 1, 213 USPQ 13 n. 1 (Cust. & Pat.App.1982); *In re Mogen David Wine Corp.*, 51 CCPA 1260, 1270, 328 F.2d 925, 933, 140 USPQ 575, 581–82 (1964) (Rich, J., concurring). The board basically mislabeled as "utilitarian" the ornamental features common to both the dolls and appellant's drawings, there being no engineering advantage conferred upon the dolls by the features involved here. We find no merit in the argument that, by virtue of the aesthetic features identified by the board, appellant's drawings are unable to perform as trademarks for toy dolls.[5] *See In re Penthouse International Ltd.*, supra, and cases cited therein.

In view of the foregoing, we *reverse* the board's decision sustaining the examiner's refusal of appellant's applications.

**REVERSED**

amount of imagination is required of the prospective purchaser to imbue a plastic figure, even one dressed in blue tights and red cape, with the dynamic qualities of the Man of Steel which appellant's drawing conjures.

4. We agree with Judge Nies that, absent a conflicting claim of right to use designs embodied by appellant's drawings, the question of possible loss of rights by appellant in the future is not before us.

5. Nothing in *In re Deister Concentrator Co.*, 48 CCPA 952, 289 F.2d 496, 129 USPQ 314 (1961), which was cited by the board, militates against this conclusion. In *Deister*, the court determined that the substantially rhomboidal outline shape which appellant sought to register as a trademark for ore concentrating and cleaning tables was in essence utilitarian and, therefore, subject to an overriding policy of preserving the public right to copy it. As we have indicated, no similar public interest has been identified in this case.

RICH, Judge, concurring.

I concur in the result, but for the following reasons.

### Capability of Functioning as a Trademark

Citing *In re Abcor Development Corp.,* 588 F.2d 811, 815, 200 USPQ 215, 219 (Cust. & Pat.App.1978) (Rich, J., concurring), where it was noted that, "The ultimate in descriptiveness is the *name* of a thing," the TTAB concluded:

> We think it is fair to extend this proposition to the conclusion that the ultimate in descriptiveness in this situation is a *picture* of the character represented by a toy doll.

The TTAB also said, "If a word may be descriptive, so may a picture."

Completing the circle from name to picture and back to name, what the TTAB has done, sub silentio, is to imply that the word-mark SUPERMAN, registered by appellant for the identical goods involved herein, is in fact not a mark as applied to Superman dolls and that appellant's registration thereof for such goods is invalid.[1] However, the fact is that the word SUPERMAN and a stylized drawing of SUPERMAN (separately or in combination) *are* trademarks for many different types of goods.[2] Accordingly, the three-dimensional doll configuration is actually a three-dimensional representation of a trademark, whether that trademark is considered to be the word SUPERMAN or a drawing of the SUPERMAN character, conceptually two different versions of the same trademark. Alternatively, one may consider the goods to be a doll bearing appellant's trademark. Either way, while a drawing of those goods necessarily describes them, it is not "merely de-

[1]. The TTAB noted that, "Applicant, as part of its effort to secure the reversal of the refusals of registration, has referred to various registrations it has obtained for word marks (e.g., 'BATMAN') and word and design marks (e.g. 'BATMAN' and design of face and spread cape) for various goods. One of these registrations, as pertinent as any, is Registration No. 1,070,-290, issued July 26, 1977, for the word mark 'SUPERMAN' for toy doll figures. None of these registrations, however, is in point because none is for a mark which is, in effect, an illustration of the goods, and the fundamental question in these applications is whether an artistic rendition of a fictitious character can serve as a trademark for what is a somewhat cruder three-dimensional toy doll version of the same fictitious character." I regard the registrations, especially that singled out by the TTAB, as clearly relevant in determining registrability of the drawings, since the words SUPERMAN, BATMAN, and JOKER conjure up the images those drawings portray.

[2]. The record shows that SUPERMAN has been registered for toy doll figures, that SUPERMAN in combination with a full figure drawing has been registered for magazines, that the SUPERMAN logo, with name and drawing of head and torso, has been registered for magazines, that the SUPERMAN logo, with the name in telescopic lettering, has been registered for cartoons in a series, and that a full figure drawing of SUPERMAN has been registered for shirts. Applicant has also registered a full figure drawing of SUPERMAN for electric lamps, night lights, and bicycle reflectors (Reg. No. 1,187,-512), for adults' and childrens' clothing (Reg. No. 1,184,662), and for various book, desk, and paper products (Reg. No. 1,178,048). Published for opposition in the Official Gazette of April 13, 1982, were three more applications for registration of a full figure drawing of SUPERMAN; one for jewelry, watches, and clocks; another for various audiovisual records and tapes, radios, eyeglass frames and cases; and the last for bubble bath. In that same edition of the Gazette, two applications for registration of the word SUPERMAN are found; one for mirrors and the other for books, greeting cards, notepads and posters, paper napkins, paper tablecloths, calendars, pencil sharpeners, cardboard centerpieces, and writing slates. In the Official Gazette of April 20, 1982, three more applications for registration of a full figure drawing of SUPERMAN were published for opposition; one for bubble gum, the second for bowls, mugs, glasses, cookie jars, toothbrushes and hair brushes made of plastic, and the third for shower curtains, towels, sheets, pillow cases, blankets, comforters, and drapes.

Likewise, a BATMAN full figure drawing is registered for shirts. The BATMAN logo, incorporating his head and cape is registered for magazines. The BATMAN logo, with name and drawing of his head and cape is registered for magazines and for cartoons in a series. The record also contains six registrations for the word BATMAN which span eight different classes and name over 140 different goods upon which the mark was, and may still be, used.

The certified record contains one registration for the word JOKER, naming toy doll figures as the goods.

scriptive" within the meaning of Section 2(e)(1) of the Lanham Act, nor is it incapable of functioning as an identification of source, the singularly prominent impression given by those goods being a well-known and famous trademark.

Given the evidence, the board opinion, taken to its logical conclusion, suggests that a stylized drawing of SUPERMAN can be a trademark for anything but a three-dimensional toy doll designed as SUPERMAN. In other words, because the SUPERMAN doll embodies a trademark and is therefore a unique product, no one else having the right to manufacture or sell such dolls, the TTAB opinion amounts to a holding that the alleged mark sought to be registered is generic to such goods. That was error.[3] If a product design can legally function as a trademark, *In re Morton-Norwich Products, Inc.,* 671 F.2d 1332, 213 USPQ 9 (Cust. & Pat.App.1982), a trademark design can be embodied as a product, and marketed as such, without that design necessarily being denied trademark status.

*In re Penthouse International Ltd.,* 565 F.2d 679, 195 USPQ 698 (Cust. & Pat.App. 1977), contrary to the TTAB's view, is an analogous case. There, where the specimens submitted to the PTO were bracelets to which three-dimensional embodiments of the mark were affixed as charms, it was stated:

> The record shows that the stylized key design was chosen because Penthouse was using it as a trademark on other products. With respect to those other products, the mark is unquestionably arbitrary and fanciful. With respect to jewelry in general the mark itself has no nontrademark meaning. That one of Penthouse's jewelry items takes the form of its trademark does not strip the mark itself of its arbitrary and fanciful characteristics.

Although in *Penthouse* appellant was attempting to register the three-dimensional configuration of the mark itself—the goods—it must be presumed, using the reasoning of the TTAB in this case, that the TTAB would also have refused registration for jewelry had Penthouse attempted to register as a mark a picture of the stylized key logo. Yet in commenting on *Penthouse* in this case, the TTAB stated that, "Had specimens consisting of box labels * * * bearing a small embossed version of the mark been presented, it was conceded that registration would not have been refused." That position and the one taken by the TTAB here are entirely inconsistent.

The TTAB here remarked that, "The question presented in this case is whether a picture of a fanciful or fictitious human figure can be a registrable trademark for the toy doll version of the same fanciful or fictitious comic book character." More precisely, the issue here is whether a trademark may be registered for a three-dimensional rendering of that trademark. For the above reasons, I conclude that it may be.

### *Functionality*

The TTAB stated (211 USPQ at 837):

> It is our opinion that the designs of the three dolls involved in this appeal are *quintessentially utilitarian.* A child who wants to playact with dolls an adventure involving the character "Superman" or the character "Batman" or the character "Joker" would simply not be satisfied with any doll that was not a replica of the appropriate character. The customary dress, accoutrements and facial expression of the character are indispensable elements of the commercial appeal of the product. Thus, these features are *commercially functional.* The artistic renditions of the dolls, as presented on the cartons and shown in the drawings of

---

**3.** In early prosecution before the PTO the applicant observed that "it is not unusual in the toy industry for a particular display of a doll to be visually the same as the mental impression created by the trademark, which operates to name the doll and distinguish [it] from those sold by others." This market observation respecting unique product design is entirely consistent with Judge Nies's source v. goods identification "truism" discussion, with which I wholeheartedly agree.

the applications, are informative depictions of the contents of the boxes and, further, serve to reinforce the desirability of the dolls by assisting a child to associate the dolls more closely within the characters as seen in other contexts and to identify with the adventures of the characters represented by the dolls. Hence, the designs are *functional in a utilitarian sense* and for that reason are not trademarks. [Emphasis added.]

This analysis is flawed in several respects. The principal error is the conception that the doctrine of functionality applies to this case.

Preliminarily, it is noted that appellant is not attempting to register as a trademark the goods themselves; it is attempting to register in each case a stylized drawing representative of the goods. The TTAB, in discussing this basis for rejection, consistently referenced the designs of the *dolls* rather than the drawings sought to be registered, apparently convinced that if it could demonstrate that the designs of the products were de jure functional and therefore unprotectable as trademarks, a similar fate would necessarily befall the drawings. That is, the goods and the drawings were deemed legally one and the same.

Clearly, the *drawings* of the goods here are not de jure functional—they possess no de facto function at all, save their communication function. The question is, therefore, if the PTO can demonstrate that a particular configuration of goods is de jure functional, does that necessarily render a picture or drawing of those goods unregistrable as a trademark therefor? The answer, undoubtedly, is yes, for a finding of de jure functionality is, in a sense, similar to a rejection for genericness, that is, it is a conclusion that others have the right to make and sell the item so designed (and, concomitantly, the right to utilize a picture or drawing of the item in their pursuit of business).

Turning to the merits of the "functionality" rejection, the TTAB stated (211 USPQ at 837–38):

> The dolls in this case possess "engineering", i.e., utilitarian, function. Take away the facial expressions, the clothes and the accompanying props, and all that are left are pieces of molded plastic of no distinction whatsoever, undesired and unsaleable. The designs depict the very details which make the dolls commercially viable.

Putting aside the question of what is meant by the "engineering" function of the appearance of a character doll, the dolls here possess no utility except as dolls—and numerous designs will do for that purpose. The fact that removal of the dolls' clothes leaves a bare piece of molded plastic is determinative of nothing. It only demonstrates that the costumes—which are part of the design—are what give the dolls their unique identities as SUPERMAN, BATMAN, and JOKER.[4]

The utilitarian functionality rejection is untenable in view of *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 213 USPQ 9 (Cust. & Pat.App. 1982). Superiority in the utility or economy of manufacture of a doll is neither wholly nor in any part connected to the use of the particular design of appellant's dolls or their costumes.

This is not the end of the matter, however, for in formulating its opinion, the TTAB clearly intermingled the concepts of utilitarian functionality and what has been termed "aesthetic functionality." The TTAB noted that the doll designs were "commercially functional" because the various well-known features thereof "are indispensible elements of the commercial appeal of the product."

A design has been said to be functional in an "aesthetic" sense and, therefore, not pro-

---

4. It may be, however that even without their familiar costumes, at least BATMAN and JOKER are identifiable. BATMAN's distinctive mask is not removable, but is molded as part of the doll. As appellant noted before the TTAB, JOKER is molded to include a large distinctive smile covering almost half of his face and showing nearly a full set of teeth, an elongated chin, furrowed brow, thick black eyebrows, green wavy long hair with a widow's peak, and "an evil leer."

tectable as a trademark if it is "an important ingredient in the commercial success of the product," *Ives Laboratories, Inc. v. Darby Drug Co.,* 601 F.2d 631, 643, 202 USPQ 548, 557 (2d Cir. 1979), if it constitutes "the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product," *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 917, 208 USPQ 718, 723 (9th Cir. 1980), or if it is "said to connote other than a trademark purpose," *Vuitton et Fils S. A. v. J. Young Enterprises, Inc.,* 644 F.2d 769, 773, 210 USPQ 351, 354 (9th Cir. 1981) (citing *Pagliero v. Wallace China Co.,* 198 F.2d 339, 343, 95 USPQ 45, 48 (9th Cir. 1952)).

Although this expansive definition of what is functional in an "aesthetic" sense appears troublesome, its import becomes clearer upon study. In the case of utilitarian functionality, a determination of de jure functionality is conclusive, that is, any showing of trademark function—secondary meaning—will be termed "de facto"; it will not dissuade a court or the PTO from holding the subject design to be unprotectable (or unregistrable) as a trademark. *In re Deister Concentrator Co.,* 48 CCPA 952, 289 F.2d 496, 129 USPQ 314 (1961). In the case of "aesthetic" functionality, on the other hand, it would appear that a demonstration of secondary meaning is crucial. The Ninth Circuit labels as aesthetically functional a design which connotes "*other than* a trademark purpose," or which constitutes that which the consumer wishes to purchase "*as distinguished from* an assurance that a particular entity made, sponsored, or endorsed

a product." In other words, the reasoning is circular. If a design which is sought to be protected as a trademark can be demonstrated to so function, it will be protected as a trademark; it will not be said that its only function is as an aesthetically pleasing design.[5]

With respect to the notion that a design is aesthetically functional if it is "an important ingredient in the commercial success of the product," it is noted that many trademarks hold such a place of importance. In any event, it is sufficient in this case that the involved drawings embody subject matter well-known and famous; the fact that consumers may wish to purchase appellant's dolls for their inherent ornamental characteristics is secondary—the characters themselves are trademarks. *Cf. Vuitton et Fils S. A. v. J. Young Enterprises, Inc.,* supra at 773, 210 USPQ at 354 et seq. (Court disagrees with interpretation "that any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional element of that product.")

Further commentary on the Ninth Circuit analysis of aesthetic functionality was recently provided by the Third Circuit Court of Appeals in *Keene Corp. v. Paraflex Industries, Inc.,* 653 F.2d 822, 825, 211 USPQ 201, 203–04 (3d Cir. 1981):

The difficulty with accepting such a broad view of aesthetic functionality, which relates the doctrine to the commercial desirability of the feature at issue without consideration of its utilitarian function, is that it provides a disincentive for development of imaginative and at-

---

**5.** Although the sundry facts involved in various disputes aid in distinguishing some cases from others, attempted definitions of "aesthetic functionality" remain somewhat confusing. Some courts seem to treat a demonstration of secondary meaning as the opposite side of the "aesthetic functionality" coin. *Major Pool Equipment Corp. v. Ideal Pool Corp.,* 203 USPQ 577, 582 (N.D.Ga.1979); *PPS, Inc. v. Jewelry Sales Representatives, Inc.,* 392 F.Supp. 375, 384, 185 USPQ 374, 380 (S.D.N.Y.1975). Others take what appears to be a balancing approach, weighing on opposite sides of the scale the ornamentation and source identification

functions of a design. *Vuitton et Fils S. A. v. J. Young Enterprises, Inc.,* 644 F.2d 769, 774, 777, 210 USPQ 351, 355, 357 (9th Cir. 1981); *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 919, 920, 208 USPQ 718, 724, 725 (9th Cir. 1980). Still other courts, as in the case of utilitarian functionality, keep completely separate the issues of functionality and secondary meaning. *Keene Corp. v. Paraflex Industries, Inc.,* 653 F.2d 822, 827, 211 USPQ 201, 205 (3d Cir. 1981); *Famolare, Inc. v. Melville Corp.,* 472 F.Supp. 738, 744–45, 203 USPQ 68, 74 (D.Hawaii 1979).

tractive design. The more appealing the design, the less protection it would receive. As our ambience becomes more mechanized and banal, it would be unfortunate were we to discourage use of a spark of originality which could transform an ordinary product into one of grace. The doctrine of aesthetic functionality need not be construed in such a manner for it to fulfill its important public policy function of protecting free competition.

Instead, the inquiry should focus on the extent to which the design feature is related to the utilitarian function of the product or feature. When the design itself is not significantly related to the utilitarian function of the product, but is merely arbitrary, then it is entitled to protection as a design trademark if it has acquired the distinctiveness necessary to achieve a secondary meaning.

Thus, it is arguable that there is no "doctrine" of aesthetic functionality which stands alone, without consideration of the more traditional source identification principles of trademark law. To the extent that there may be—at least with respect to ex parte prosecution practice—it has been previously rejected by this court. *In re Mogen David Wine Corp.*, 51 CCPA 1260, 1267–68, 328 F.2d 925, 931, 140 USPQ 575, 580 (1964) ("On the basis of the record before us * * * we cannot accept the ['functionality in ornamentation'] approach."); *In re World's Finest Chocolate, Inc.*, 474 F.2d 1012, 1015, 177 USPQ 205, 207 (Cust. & Pat.App.1973) (court distinguished case where "the design trademark consisted of three narrow white concentric rings on the dark sidewall surface of a tire. We concluded that through long familiarity with whitewalls as tire ornamentation, the public would consider a three-ring whitewall as just a refinement of a general *ornamental concept rather than a trademark.* No evidence of distinctiveness had been submitted. The *General Tire [& Rubber Co.,* 56 CCPA 867, 404 F.2d 1396] case is inapposite here in view of our finding that appellant's package design identifies and distinguishes the goods to which it is applied."

[Emphasis added.] ); *In re Penthouse International Ltd.*, 565 F.2d 679, 682, 195 USPQ 698, 700 (Cust. & Pat.App.1977) ("The 'ornamentation function' basis of rejection, argued here by the solicitor, was summarily rejected by this court on a related issue in *Mogen David*, and is without merit.").

Accordingly, the holding of the TTAB that the drawings sought to be registered are functional, either in a utilitarian or in an aesthetic sense, is without foundation. *See In re Paramount Pictures Corp.*, 213 USPQ 1111 (TTAB 1982).

It is for the above reasons that the decision of the board should be reversed.

NIES, Judge, specially concurring.

I join in the opinion of the majority. The only decision made by the board was that the subject designs were incapable of functioning as trademarks. I agree this was error and must be reversed. These additional comments are with respect to several misconceptions I perceive in arguments advanced by appellant and in the board's opinion and which the majority opinion does not specifically address.

Appellant asserts that it is "well settled that 'designs which are *inherently distinctive* can be registered and protected as marks without the need for proof of secondary meaning' (emphasis in original). McCarthy, TRADEMARKS & UNFAIR COMPETITION 164 (1973)." The quoted statement is taken from a discussion of the registrability of a label design and does not provide any authority for appellant's statement with respect to the registrability of a product design, or a representation of a product.

Moreover, what appellant seeks to do here is not comparable to registering a label design as a trademark for motor oil or a bottle design for wine. Rather, the more appropriate comparison would be to registering a label design for labels, or a bottle design for bottles. There are different considerations where one seeks protection of a product design itself, and I have found no precedent in decisions of this court, or oth-

ers, which recognizes the protectibility of any *product* design as a trademark for that *product* without proof of distinctiveness, that is, distinctiveness as an indication of *origin,* not simply that it is a distinctive design in the sense of being unusual. The semantics, in referring to a design as "distinctive," impedes clarity in analysis. In any event, a product design or a representation of a product is manifestly equivalent to words which describe its appearance and must be given the same treatment as inherently descriptive words. Descriptive designations are not presumed to function as indications of origin immediately upon first use, unlike arbitrary word marks or arbitrary logo designs, but rather must be used for some period of time before acquiring the status of a trademark.[1]

In my view, *deferred* recognition of a product design as a trademark for the product not only is the law, but should remain the law for a number of reasons. The first is factual. The public simply is not likely to associate origin immediately with the shape of goods (or a representation thereof) although the more unusual the design the more quickly that is likely to occur. In our economy, we expect that similar products will come from a number of sources, and the acquisition of trademark rights in a design may be prevented by the timely entry of others into the market using the same or similar designs. On the other hand, once a design does come to indicate a source, the public interest in not being con-

fused in the market place outweighs the right of a competitor ordinarily to imitate another's product. Thus, deferred protection represents a balance of two competing public interests.

This assumes, of course, that the design is not "utilitarian" and I agree that the subject designs are not, for reasons stated fully in the other opinions. I would only add that denominating a feature "utilitarian" states, in effect, the conclusion that the public interest is best served by not allowing a particular design to be appropriated from the "public domain." Like generic terms, they should remain permanently available for competitors to use freely. *In re Deister Concentrator Co.,* 48 CCPA 952, 968, 289 F.2d 496, 505, 129 USPQ 314, 323 (1961). The board apparently believed that a design which is "descriptive or functional and for that reason is not registrable ... may be subject to some judicial protection against copying." The board's discussion of why features which make a product successful in the market place are "functional" has no legal significance if the features can be exclusively appropriated, that is, are subject to "judicial protection."

With respect to the aesthetics of a product, the better reasoned authorities have come down on the side of recognition of exclusive rights, after the public has learned to associate those aesthetics with a single source,[2] thereby encouraging the development of different designs and providing a wider range of selection in the market

---

1. I find this inherent in Judge Rich's analysis. However, I cannot subscribe to Judge Rich's opinion insofar as it is based on the premise that "the doll configuration is actually a three-dimensional representation of a 'trademark'." One must designate for what goods the design is a trademark to avoid treating a trademark as a right in gross. Thus, even assuming that the SUPERMAN doll is a representation of a trademark for comic books (for which a variation of the subject design is registered) and could be a three dimensional trademark for such goods if used in association with their sale, the doll does not thereby become a trademark for itself, that is, for dolls, although the comic book registration would be pertinent evidence of secondary meaning. Trademark Manual of Examining Procedure § 1211.03. Moreover, this pre-existing "trademark" analysis does not comport

with the record concerning appellant's JOKER design which has not previously been registered or proved to be a trademark for other goods. Appellant's exhibits show only various action poses of the JOKER character on the cover of a notebook and in or on comic books. Contrary to appellant's argument, not every display of these designs on goods is trademark usage. For example, the appearance of the JOKER in a story in a BATMAN comic book does not make the JOKER a trademark for the book.

2. *Vuitton et Fils S. A. v. J. Young Ent. Inc.,* 644 F.2d 769, 210 USPQ 351; 212 USPQ 85 (CA 9 1981); *Keene Corp. v. Paraflex Ind., Inc.,* 656 F.2d 722, 825, 211 USPQ 201, 203–04 (CA 3 1981).

place. Diversity in the market place is viewed by such courts as a desirable public objective, and it is an objective with which I am in agreement.[3]

Another matter of public policy, which appears to have concerned the board, is that if trademark rights are recognized in a picture of a product, the product design itself may be perpetually protected, contrary to the limited term of protection afforded some designs under the copyright or design patent statutes. If that concern were overriding, only a design not subject to such protection would be available for appropriation as a mark while a more original design would not. Or one would have to elect which type of protection to seek. Or no trademark protection at all should be given any product designs since trademarks by their nature are for no fixed time period.

Given the differing concepts of these statutes, this court has adopted the position that each statute must be interpreted independently of the other, *In re Deister,* supra, and that no one of these statutes, affording protection to a design, preempts the other, *In re Mogen David Wine Co.,* 51 CCPA 1260, 328 F.2d 925, 140 USPQ 575 (1964). If the doll and/or the cartoon drawing and/or the package design are copyrightable subject matter,[4] these rights of limited duration are not the totality of rights Congress has provided for the subject product designs

but merely part of them.[5] Thus, their existence does not afford a basis for refusing to grant a registration for the doll, or a representation of the doll, as a trademark, if it would otherwise qualify for registration under the Lanham Act.

A basic misconception in this connection is that registration or recognition as a trademark would *secure* perpetual rights in the doll design. Trademark rights can only be found to exist or not to exist at a particular point in time, and registration neither extends the period of one's right of exclusive use nor guarantees protection at any time in the future. The responsibility of the Patent and Trademark Office is to determine whether registration of a particular design would interfere with the legitimate rights of any other source or potential source of competing, or related, goods at the time the application is processed. None have been identified here. Obviously, the subject designs are not necessary for competition if their use by others can be entirely barred under the copyright statute. If others become entitled to use the designs upon the expiration of copyright protection, the continued registration of the designs as trademarks may be addressed in the context of a conflicting claim of a right to use, but the question of possible loss of rights is not before us.[6]

3. The opinions where courts have, in infringement actions, used the expression "aesthetic functionality" or the like will, on close examination, be found to involve other factors, such as loss of rights by acquiescence in use by others.

4. A copyright notice appears on the body of the doll as well as on the package. Appellant has asserted that the design is copyrighted, but no other evidence is of record.

5. 15 U.S.C. § 1091 specifically provides in pertinent part:

 *Nature of mark.* For the purposes of registration on the supplemental register, a mark may consist of any trademark, symbol, label, package, *configuration of goods,* name, word, slogan, phrase, surname, geographical name, numeral, or device or any combination of any of the foregoing, but such mark must be capable of distinguishing the applicant's goods or services. [Emphasis added.]

For purposes of this discussion I am accepting the board's premise that the subject designs are representations of the respective products.

6. In this respect, a product design raises a somewhat different issue of public interest from a container design. Just as the same word mark may be used as a trademark by producers of disparate goods without confusion of the public, the same or similar container designs could be used without confusion on unrelated goods or could be sold simply as a container. Thus, on expiration of patent protection in a container design, that design could be used legitimately by others to some extent despite the continued existence of trademark rights. On the other hand, if a copyrighted doll design is also a trademark for itself, there is a question whether the quid pro quo for the protection granted under the copyright statute has been given, if, upon expiration of the copyright, the design cannot be used *at all* by others. Whether there should be a temporary, perma-

Moreover, the existence of copyright or patent protection in a product design does not insure the acquisition of any trademark rights. Only public reaction to one's actual *use* of the design can lead to protection as a trademark, a factual question that remains despite the *right to keep others from using* one's design which may be granted under the copyright or patent statutes.

### Source Versus Goods Identification

In refusing registration, both the examiner and the board sought to rely on the "truism" that a trademark functions to indicate the source of goods, not the goods themselves. The examiner expressed this principle by refusing registration on the ground that each design "relates to and identifies the goods as to kind and not as to origin." The board advanced the same conclusion in somewhat different terms, reasoning that "the name of a game [toy?] which has no other possibly descriptive name (and the equivalent picture of a toy which has no other possibly descriptive name) is not a trademark and cannot be registered."[7] Similarly, the solicitor argues that SUPERMAN toy doll is "a common name" and that the Superman design is a "common descriptive representation" of that doll. Each of these statements is a variation of the theory that a word, name, symbol, or device which identifies a class of goods is a generic type of identification and a unique product or product design is a class unto itself. Such an interpretation of the basic truism must be rejected. No principle of trademark law requires the imposition of penalties for originality, creativeness, attractiveness, or uniqueness of one's product or requires a holding that the name arbitrarily selected to identify the product, or a unique product design of a product, cannot also function as an identification of source. Indeed, it is only if the product design *is* unique that the public may come to rely

upon it as an indication of source. *In re Minnesota Mining & Manufacturing Co.,* 51 CCPA 1546, 335 F.2d 836, 142 USPQ 366 (1964).

The rationale adopted by the PTO in this case loses sight of the basic objectives underlying trademark law: protection of trade identity, which may be the most valuable asset of a business, and protection of the public from confusion created by those who would encroach on an identity which the public associates with another. Any truism of trademark law cannot be applied as a mere legalism, but rather must be interpreted in light of these objectives and should reflect regular commercial practices and normal commercial speech.

The above "truism" has meaning in the context of the market place in seeking an answer to the question: Does the asserted mark distinguish one manufacturer's or merchant's goods? It states no more than the basic concepts that a word, name, symbol, or device which is inherently descriptive (and has not acquired distinctiveness) or a term which is inherently generic or which the public has made generic does not, in fact, distinguish the goods of a particular source. The application of the truism depends upon how the public perceives and uses the asserted mark, as well as upon accepted business practices. It becomes sophistry if the generic nature of a word or name depends on how broadly or narrowly the board, or a court, defines a "kind" of "class" of goods. Competing products in our economy need not be precisely identical. Competitive products are commonly promoted on the basis of their differences, the better brightener in a toothpaste or detergent, the more effective relief of an analgesic, antihistamine, or eye wash, the more alluring fragrance of a particular perfume, the appealing design of particular tableware, automobiles or jeans, the greater dur-

---

nent, or no loss of trademark protection at that time must await resolution in an appropriate case and I merely note the problem. At least during the term of copyright here, if any, I find no reason to deny trademark rights.

7. *In re Cooper,* 45 CCPA 923, 254 F.2d 611, 117 USPQ 396, *cert. denied,* 358 U.S. 840, 79 S.Ct. 63, 3 L.Ed.2d 75 (1958), cited by the board, stands for no more than that the name of a single book is generally not deemed a trademark for the book.

ability of a particular maker's washing machine, the greater excitement of playing a particular game, the long-lasting quality of a particular makeup, the unique flavor of a brand of chicken, beer, soup, pie or pizza, the better results of a particular weight control program or speed reading course, the sound of a particular musical group. Under the PTO view, each of these products and services could be deemed a "kind" or "class," and the particular means by which the public identifies it would be condemned as a generic designation regardless of its useful function to the public. Trademark protection would then be limited to house marks and to marks for fungible goods and would be eliminated for trademarks (whether name or design) applied to single products available only from single producers.

The principle that a trademark must indicate "source" and not "goods" does not condemn single product word marks or designs. A word, name, symbol or device indicates "source" within the meaning of the truism if it indicates *goods of one producer* to the public, and it indicates "goods" if the public does not identify the asserted mark with goods from a particular source. The board apparently interpreted the truism as imposing a requirement that to indicate "source," a word, name, symbol, or device must not identify *goods* of anyone. This misunderstanding led the board and has led some courts into an esoteric and extraneous inquiry focusing on what motivates the purchasing public to buy particular goods, the product itself or the source. Once it is understood that a trademark *is* functioning to indicate "source" when it identifies *goods* of a *particular* source, the truism then reflects the above-stated objectives of trademark law and the way trademarks actually function in the marketplace. The reason the public is motivated to buy the product, whether because of quality, particular features, source, pleasing design, association with other goods, price, durability, taste, or prestige of ownership, is of concern to market researchers but is legally immaterial to the issue of whether a particular designation is generic. Thus, the board's reliance

on its conclusion that purchasers want appellant's dolls "and would simply not be satisfied" with any others is misplaced. This rationale ignores the reality that the primary objective of purchasers is to obtain particular goods, not to seek out particular sources or producers, as such. Motivation does not change a descriptive term which has acquired distinctiveness or an arbitrary word, name, symbol or device into a generic designation. The correct inquiry is whether the public no longer associates what was a trademark with that single source.

Similarly, that purchasers call for a particular product by the name given it by its producer or source does not negate its function as a mark. Such a given name is a proper name, like the name of an individual, not a generic name, so long as the public uses it to identify a product of a single source. It is the normal way the public uses a mark which is applied by a manufacturer or a merchant to a particular product, and, as indicated, trademark concepts do not require the condemnation of normal commercial language. Trademark law merely condemns the use of that language in a way which deprives purchasers of their expectations and deprives businesses of the goodwill which they have built up by providing satisfactory goods and services. For the same reason, that a trademark is well known does not make it a "common" descriptive name. "Common," like "generic," states a conclusion that the claimed mark is, or has become, part of the vernacular, that it is indefinite, and does not function as a proper name of a particular producer's goods.

No doubt producers would like trademark law to offer continuous protection as a matter of right merely because of their efforts or investments in creating products and goodwill. However, trademark protection takes its lead from the public. Protectibility is lost when the public uses what was a proper name to denominate like or similar goods from other sources as well. It no longer serves the public as a mark.

Thus, to refuse registration on the ground that an applicant seeks to register

the generic name of the goods, the PTO must show that the word or expression inherently has such meaning in ordinary language,[8] or that the public uses it to identify goods of other producers as well. *In re G. D. Searle & Co.*, 53 CCPA 1192, 360 F.2d 650, 149 USPQ 619 (1966). In the absence of actual competition, I believe it is beyond the province of the board to speculate whether an arbitrary designation may become generic. Public usage is simply not predictable.

Since the board's premise with respect to word marks is in error, any conclusion drawn therefore with respect to product designs must also fail. With respect to product designs, registration, at least on the Supplemental Register, should not be refused as incapable of being a mark unless the design is common or functional.

---

**8.** This was the thrust of Judge Rich's concurrence in *In re Abcor Dev. Corp.*, 58 F.2d 811, 815, 200 USPQ 215, 219 (Cust. & Pat.App. 1978), and, thus, does not provide support for the board's decision here.