**BRUNSWICK CORPORATION,**
Appellant,

v.

**BRITISH SEAGULL LIMITED and**
**Outboard Marine Corporation,**
Cross–Appellants.

Nos. 94–1049, 94–1050.

United States Court of Appeals,
Federal Circuit.

Sept. 14, 1994.

Rehearing Denied; Suggestion for
Rehearing In Banc Declined
Oct. 24, 1994.

Timothy J. Haller, Niro, Seavone, Haller & Niro, Chicago, IL, argued for appellant. With him on the brief were John C. Janka and Michael P. Mazza; Raymond P. Niro, Samuel L. Alberstadt and Raymond P. Niro, Jr., of counsel.

Robert E. Clemency, Michael, Best & Friedrich, Milwaukee, WI, argued for cross-appellants. With him on the brief was Lee J. Geronime.

Before: MAYER, RADER, and SCHALL, Circuit Judges.

RADER, Circuit Judge.

The Mercury Marine division of Brunswick Corporation appeals the decision of the Patent and Trademark Office's Trademark Trial and Appeal Board (Board) sustaining Opposition Nos. 80,900 and 80,901. *British Seagull Ltd. v. Brunswick Corp.*, 28 USPQ2d 1197 (TTAB 1993). The Board refused to register the color black as a mark for Mercury's outboard motors. Because the color black is de jure functional in this instance, this court affirms.

## BACKGROUND

Mercury has manufactured and sold marine outboard engines for over thirty years. In 1962, Mercury introduced its first all black outboard engine. Since 1964, all Mercury outboard engines have been black.* In the last three decades, Mercury has spent over

---

* The Board noted that although Mercury seeks registration of its "all black" engine color, Mercury has never sold an all black engine devoid of any other colors or markings. Indeed, the engines have contained striping decals and the

$100 million in advertising and generated $3 billion dollars in sales of its outboard motors. Some of Mercury's advertisements focused on Mercury's "all black" color. Mercury engines were not, however, the only black outboard engines on the market during that time. British Seagull Ltd., Sears, Roebuck & Co., and Outboard Marine Corp. also produced black engines or dark engines virtually indistinguishable from black.

On April 27, 1988, Mercury filed an application to register the color black for outboard engines on the Principal Register. Relying on 15 U.S.C. § 1052(f) (Supp. V 1993), Mercury claimed that the color black, while not inherently distinctive, acquired secondary meaning and served as a trademark for Mercury's outboard engines. The Examining Attorney allowed the registration. British Seagull Ltd. and Outboard Marine Corp. (the opposers) filed Opposition Nos. 80,900 and 80,901. Upon motion of the parties, the Board consolidated the oppositions.

The Board considered the proposed mark's functionality:

> [A]lthough the color black is not functional in the sense that it makes these engines work better, or that it makes them easier or less expensive to manufacture, black is more desirable from the perspective of prospective purchasers because it is color compatible with a wider variety of boat colors and because objects colored black appear smaller than they do when they are painted other lighter or brighter colors. The evidence shows that people who buy outboard motors for boats like the colors of the motors to be harmonious with the colors of their vessels, and that they also find it desirable under some circumstances to reduce the perception of the size of the motors in proportion to the boats.

*British Seagull*, 28 USPQ2d at 1199. The Board concluded that the color black, applied to the engines, is de jure functional because of competitive need.

"MERCURY" trademark. However, the Board treated Mercury's proposed mark as the color black irrespective of lettering or decals also appearing on the engines. This court will do likewise.

The Board next ruled on evidentiary matters. The Board refused to consider materials which Mercury submitted to the Examining Attorney to show registrability under 15 U.S.C. § 1052(f) because they were not part of the record in the *inter partes* opposition proceeding. The Board also denied the opposers' request to exclude some of Mercury's evidence: Harold Exhibit 5, DuCoty Exhibits 1 & 2, the Mantis survey, Mellenthien Exhibit 253, Piper Exhibits 2 through 6, and related testimony.

On the merits of distinctiveness, the Board held that Mercury did not show secondary meaning. Mercury presented, *inter alia,* a survey (the Mantis survey) in which 73% of the respondents associated black outboard engines with a single source. The Board found that this survey did not show that black was a source indicator for Mercury goods.

The Board also found that Mercury's use of black on outboard engines was not exclusive. Several of Mercury's competitors in the outboard market had engines colored black or dark colors easily perceived as black. Moreover, Mercury contributed to third party use of black on outboards by supplying an all black engine to an independent retailer for resale to the general public.

The Board concluded that Mercury's all black color for outboard engines was not registrable. Mercury appeals from the Board's decision holding that the color black applied to its engines is de jure functional and without secondary meaning. The opposers cross-appeal the Board's decision to admit Harold Exhibit 5, DuCoty Exhibits 1 & 2, the Mantis survey, Mellenthien Exhibit 253, and Piper Exhibits 2 through 6.

## ANALYSIS

### I. De jure Functionality

#### A.

A trademark is "any word, name, symbol, or device, or any combination thereof" used by a marketer "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127 (1988). A trademark protects only features which are not functional. *Textron, Inc. v.*

*United States Int'l Trade Comm'n,* 753 F.2d 1019, 1024, 224 USPQ 625, 628 (Fed.Cir. 1985). "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982). Such functional features cannot receive trademark protection.

■ Like any other mark, the use of color—if functional—cannot serve as a trademark. *In re Owens–Corning Fiberglas Corp.,* 774 F.2d 1116, 1120–21, 227 USPQ 417, 419 (Fed.Cir.1985). When "the color applied to goods serves a primarily utilitarian purpose it is not subject to protection as a trademark." *Id.*

■ Functionality is a question of fact, *In re Morton–Norwich Products, Inc.,* 671 F.2d 1332, 1340, 213 USPQ 9, 15 (CCPA 1982), and depends upon the totality of the evidence, *Owens–Corning,* 774 F.2d at 1120. A determination of functionality is reviewed for clear error. *See Stock Pot Restaurant, Inc. v. Stockpot, Inc.,* 737 F.2d 1576, 1578, 222 USPQ 665, 666 (Fed.Cir.1984). This court does not reweigh the evidence to decide anew whether the applicant's mark is functional. *See id.* at 1579. Rather, this court "accept[s] the [Board's] factual findings unless they are clearly wrong." *Id.*

#### B.

Functionality reflects a tension between two fundamental principles of trademark law. *See Morton–Norwich,* 671 F.2d at 1336–37. On the one hand, "there exists a fundamental right to compete through imitation of a competitor's product, which right can only be *temporarily* denied by the patent or copyright laws." *Id.* at 1336. Because trademark protection is potentially perpetual in duration, protection of a functional trademark would defeat that fundamental right. On the other hand, the functionality doctrine also reflects the individual's right to protect symbols which identify the source of particular goods. *Id.* at 1337. In sum, the right to protect a product feature serving as a source indicator is limited by "the *need* to copy

[articles which are not protected by patent or copyright], which is more properly termed the right to compete *effectively*." *Morton–Norwich*, 671 F.2d at 1339 (emphasis in original).

In balancing these two policies, this court acknowledges a distinction between de facto functional features, which may be entitled to trademark protection, and de jure functional features, which are not:

> In essence, de facto functional means that the design of a product has a function, i.e., a bottle of any design holds fluid. De jure functionality, on the other hand, means that the product is in its particular shape because it works better in this shape.

*In re R.M. Smith, Inc.*, 734 F.2d 1482, 1484, 222 USPQ 1, 3 (Fed.Cir.1984) (citations omitted) (quoting *Morton–Norwich*, 671 F.2d at 1338). Thus, merely labeling a design feature as functional will not necessarily defeat registrability. *In re Teledyne Indus., Inc.*, 696 F.2d 968, 971, 217 USPQ 9, 11 (Fed.Cir.1982). Rather, de jure functionality rests on " 'utility,' which is determined in light of 'superiority of design,' and rests upon the foundation [of] ... 'effective competition.' " *Morton–Norwich*, 671 F.2d at 1340.

Contrary to Mercury's assertion, the test for de jure functionality does not involve inquiry into whether a particular feature is "essential" to compete at all:

> If the feature asserted to give a product distinctiveness is the best, or at least one, of a few superior designs for its *de facto* purpose, it follows that competition is hindered. *Morton–Norwich does not rest on total elimination of competition in the goods*.

*In re Bose Corp.*, 772 F.2d 866, 872, 227 USPQ 1, 6 (Fed.Cir.1985) (emphasis added).

In sum, the "crux" of the distinction between de facto and de jure functionality—determining eligibility for trademark protection or not—is a design's effect on competition. *Morton–Norwich*, 671 F.2d at 1341. Thus, the policies underlying the functional limitation on trademark protection explicitly invoke an inquiry into competitive fairness. Therefore, the Board did not err by basing its finding of de jure functionality on competitive need. ·

## C.

Turning to the present case, the Board determined that "black, when applied to [Mercury's] outboard marine engines, is de jure functional because of competitive need." *British Seagull*, 28 USPQ2d at 1199. The color black, as the Board noted, does not make the engines function better as engines. The paint on the external surface of an engine does not affect its mechanical purpose. Rather, the color black exhibits both color compatibility with a wide variety of boat colors and ability to make objects appear smaller. With these advantages for potential customers, the Board found a competitive need for engine manufacturers to use black on outboard engines. Based on this competitive need, the Board determined that the color was de jure functional. This court discerns no error in the Board's legal reasoning and no clear error in its factual findings.

This court's decision in *Owens–Corning* does not compel a different result. In *Owens–Corning*, Owens–Corning sought to register the color pink as applied to its fibrous glass insulation. This court reversed the Board's refusal to register the color pink as Owens–Corning's trademark. The Board found that no other insulation manufacturer colored any of its products. The record revealed no reason to dye the insulation pink or any other color. Indeed, insulation in use is not open to general view at all. Owens–Corning alone undertook the additional, unnecessary step of coloring the insulation.

This court determined that no anti-competitive effects would follow from awarding Owens–Corning a mark for the color pink. *Owens–Corning*, 774 F.2d at 1123. Rather, the color served the "classical trademark function of indicating the origin of the goods," *id.* at 1123:

> We agree with the Board that the color "pink" has *no utilitarian purpose*, does not deprive competitors of any reasonable right or competitive need, and is not barred from registration on the basis of functionality.

*Id.* at 1122.

This case, as the Board found, compels a *different result*. All outboard engine manu-

facturers color their products. These manufacturers seek colors that easily coordinate with the wide variety of boat colors. The Board found that the color black served this non-trademark purpose. In addition, the Board found that the color black serves the non-trademark purpose of decreasing apparent object size. The record showed that these features were important to consumers. Unlike the pink color in *Owens–Corning,* the Board found a competitive need for the color black. Thus, the Board concluded that registration of Mercury's proposed mark would hinder competition. This court discerns no clear error in the Board's findings.

### D.

■ In evaluating competitive need, the Board correctly stated:

[W]hen we consider whether a color is functional we must consider whether alternative colors are available in order to avoid the fettering of competition. If competition will be hindered, the color in question is de jure functional.

*British Seagull,* 28 USPQ2d at 1199. This approach harmonizes with *Morton–Norwich:*

Since the effect upon competition "is really the crux of the matter," it is, of course, significant that there are other alternatives available.

*Morton–Norwich,* 671 F.2d at 1341 (citation omitted). *Cf. Bose,* 772 F.2d at 866 ("[T]his case [in which the utilitarian nature of a five-sided housing for a five-sided mechanism has been established] is unlike *Morton–Norwich* where 'an infinite variety' of container shapes remained available to competitors.").

■ The Board also referred to the color depletion theory, which acknowledges "a limited number of colors in the palette, and that it is not wise policy to foster further limitation by permitting trademark registrants to deplete the reservoir." *Owens–Corning,* 774 F.2d at 1120.

While disavowing in *Owens–Corning* the color depletion theory as a per se rule, this court nevertheless recognized its applicability in appropriate circumstances:

[The color depletion] theory *is not faulted for appropriate application,* but following passage of the Lanham Act courts have declined to perpetuate its *per se* prohibi-

tion which is in conflict with the liberating purposes of the Act.

*Id.* (first emphasis added). The functionality limitation on trademark protection properly subsumes any lingering policy concerns embodied in the "color depletion theory." The theory is not a per se bar to registration of color marks. Rather, traditional trademark policies, including the functionality limitation, set the boundaries for color mark registration. Thus, if the use of color on the applicant's goods serves a non-trademark purpose that hinders competition, the de jure functionality doctrine precludes trademark protection. Only in that sense does the "color depletion theory" have any viability. Accordingly, the Board did not erroneously apply a color depletion theory to deny registration to Mercury's proposed mark.

### E.

In *In re DC Comics, Inc.,* 689 F.2d 1042, 215 USPQ 394 (CCPA 1982), the Court of Customs and Patent Appeals specifically rejected the notion that purely aesthetic features can in themselves confer utilitarian functionality on a proposed mark. At issue were drawings of Superman, Batman and Joker as trademarks for the applicant's toy dolls. The Board refused to register the proposed mark because, *inter alia,* the drawings were mere artistic renditions of the dolls and shared commercially functional features of " 'customary dress, accoutrements, and facial expression' " with the dolls. *Id.* 689 F.2d at 1043 (quoting Board opinion). This court's predecessor reversed:

[The Board] basically mislabeled as 'utilitarian' the ornamental features common to both the dolls and appellant's drawings, there being no engineering advantage conferred upon the dolls by the features involved here. We find no merit in the argument that, by virtue of the aesthetic features identified by the board, appellant's drawings are unable to perform as trademarks for toy dolls.

*Id.* at 1045. In *DC Comics,* the court thus held that the aesthetic aspects of the applicant's drawings did not preclude registrability. A concurring opinion explained:

[I]t is arguable that there is no "doctrine" of aesthetic functionality which stands alone, without consideration of the more traditional source identification principles of trademark law. To the extent that there may be—at least with respect to ex parte prosecution practice—it has been previously rejected by this court.

*Id.* at 1050.

*DC Comics* stands for the proposition that aesthetic ingredients to commercial success are not necessarily de jure functional. Rather, traditional trademark principles govern the registrability of a proposed mark's aesthetic features. As with any mark, the test for de jure functionality hinges on whether registration of a feature hinders competition, and not whether the feature contributes to the product's commercial success.

In *Owens–Corning*, this court appeared to invoke the doctrine of aesthetic functionality:

In *Deere & Co. v. Farmhand, Inc.*, 560 F.Supp. 85, 217 USPQ 252 (S.D.Iowa 1982), *aff'd*, 721 F.2d 253 (8th Cir.1983) [per curiam], the court refused to enforce the color "John Deere green" as a common law trademark for a front-end loader on the bases that the color green was "aesthetically functional" in that purchasers wanted their farm equipment to match, and that secondary meaning had not been established. Such conditions limit an applicant's right to register a color for its goods, in order to prevent the appropriation of functional product features from the public domain. We thus consider whether the color "pink" [as applied to Owens–Corning insulation] may be so characterized.

*Owens–Corning*, 774 F.2d at 1121. A review of this commentary in context, however, shows that *Owens–Corning* did not revive the per se doctrine of aesthetic functionality rejected in *DC Comics*. Rather this court applied traditional trademark principles, including consideration of competitive factors, in assessing de jure functionality. *See id.* 774 F.2d at 1122–23. Its reference to *Deere & Co.* merely reaffirmed this court's commitment to analyzing registrability in terms of effect on competition. *See Deere & Co.*, 560 F.Supp. at 95, 98 (noting that the determinative question regarding functionality is "whether protection against imitation of the feature will hinder the competitor in competition," and finding that "protection of John Deere green and the features that are common to both products would hinder Farmhand in competition").

 In this case, the Board did not improperly deny registration to Mercury merely because black served purely aesthetic functions. Color compatibility and ability to decrease apparent motor size are not in this case mere aesthetic features. Rather these non-trademark functions supply a competitive advantage. The Board properly analyzed Mercury's use of black in terms of its non-trademark functions and its effect on competition. Indeed, the Board specifically distinguished its de jure functionality analysis from the doctrine of aesthetic functionality:

In the case at hand we are presented not with a design or configuration which is ornamental or simply more beautiful, but rather with a color which should be available for use by all manufacturers of these products because they need to use it to compete effectively.

*British Seagull*, 28 USPQ2d at 1199.

In sum, the Board analyzed Mercury's use of the color black according to the law governing the functionality limitation on trademark protection. Additionally, the Board made no clearly erroneous factual findings. Therefore, this court affirms the Board's decision that Mercury's application of the color black to the exterior surface of its outboard engines is de jure functional.

## II.

 Mercury asserts that the Board erred by failing to consider its offer to limit its application to a specific, well-defined shade of black under 37 C.F.R. § 2.133(b) (1993). This shade, "Mercury black," allegedly embraces "three dimensional quantitative lightness/chroma/hue content specifications." Mercury's offer to amend consists, *in toto*, of the following passage found in its Response Brief, filed before the Board in response to the Opposers' Main Brief:

To the extent that the Board is concerned with the issues of color depletion or shade

confusion, Mercury is willing to technically limit the range of its mark. This potential limitation can be considered by the Board under 37 C.F.R. § 2.133(b).

The Board declined to rule explicitly on the offer to amend.

Section 2.133 provides:

(a) An application involved in a proceeding may not be amended in substance ... except with the consent of the other party or parties and the approval of the Trademark Trial and Appeal Board or except upon motion.

(b) If, in an inter partes proceeding, the Trademark Trial and Appeal Board finds that a party whose application or registration is the subject of the proceeding is not entitled to registration in the absence of a specified restriction to the involved application or registration, the Trademark Trial and Appeal Board will allow the party time in which to file a request that the application or registration be amended to conform to the findings of the Trademark Trial and Appeal Board, failing which judgment will be entered against the party.

37 C.F.R. § 2.133(a), (b). Mercury did not obtain the opposers' consent or Board approval, and did not file a motion to amend. Thus, section 2.133(a) does not compel the Board to address Mercury's offer. Under section 2.133(a), the Board did not err in evaluating the application as it was published for opposition. *See Peopleware Sys., Inc. v. Peopleware, Inc.,* 226 USPQ 320, 321 n. 2 (TTAB 1985). Section 2.133(b) also does not compel the Board to address Mercury's offer. Section 2.133(a) applies to amendments during the course of *inter partes* proceedings before the Board. Section 2.133(b), however, applies only to "restrictions" pertaining to the identification of goods and services in the application. Thus, section 2.133(b) does not apply where the applicant seeks to amend the description of the mark. Furthermore, even assuming section 2.133(b) does apply here, Mercury has filed no motion or included any affirmative pleading in its answer. Therefore, the Board had no duty to address Mercury's offer to amend. *See Personnel Data Sys., Inc. v. Parameter Driven Software, Inc.,* Cancellation No. 18,719, 1991 TTAB LEXIS 26, *5 (TTAB Sept. 13, 1991).

### III. Acquired Distinctiveness

 Under 15 U.S.C. § 1052(f), marks which have become distinctive of the applicant's goods in commerce may, in proper circumstances, receive trademark registration. However, "[e]vidence of distinctiveness is of no avail to counter a de jure functionality rejection." *R.M. Smith,* 734 F.2d at 1484–85. *See also New England Butt Co. v. United States Int'l Trade Comm'n,* 756 F.2d 874, 877, 225 USPQ 260, 262 (Fed.Cir.1985) ("'One who seeks to register (or protect) a product or container configuration as a trademark must demonstrate that its design is 'nonfunctional' ... *and* that the design functions as an indication of source, whether inherently so, because of its distinctive nature ... or through acquisition of secondary meaning.'" (quoting *Morton–Norwich,* 671 F.2d at 1343) (alteration in original)). Because the Board correctly applied the functionality limitation to preclude registration, Mercury may not register the color black as applied to the exterior surface of its outboard engines. Therefore this court need not reach the issue of acquired distinctiveness.

### IV. Admissibility of Evidence

 The opposers cross-appeal, arguing that the Board erred by refusing to exclude certain evidence on grounds of hearsay and inadequate foundation. The Federal Rules of Evidence govern *inter partes* proceedings before the Board. 37 C.F.R. § 2.122(a) (1993); *Yamaha Int'l Corp. v. Hoshino Gakki Co.,* 840 F.2d 1572, 1575–76, 6 USPQ2d 1001, 1004 (Fed.Cir.1988). Any alleged error in admitting evidence is not reversible unless the opposers establish prejudice. *See id.* 840 F.2d at 1582; *Stock Pot,* 737 F.2d at 1581. In light of its rulings on the merits, this court has "no reason to fault the Board's consideration of that evidence, especially since [the opposers have] not shown prejudice to [them] from that consideration." *Stock Pot,* 737 F.2d at 1581.

AFFIRMED.