THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: March 28, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Florists' Transworld Delivery, Inc.*

_____

Serial No. 77590475

_____

Scott J. Major of Millen, White, Zelano & Branigan, PC,
    for Florists' Transworld Delivery, Inc.

Hanno Rittner, Trademark Examining Attorney, Law Office 117,
    J. Brett Golden, Managing Attorney.

_____

Before Seeherman, Bucher and Zervas,
    Administrative Trademark Judges.

## Opinion by Zervas, Administrative Trademark Judge:

Florists' Transworld Delivery, Inc. appealed from the final refusal of the trademark examining attorney to register the proposed mark shown below for "flowers and live cut floral arrangements":[1]



---

[1] Application Serial No. 77590475 was filed on October 10, 2008, based on applicant's asserted intent to use the proposed mark. Applicant subsequently filed an Amendment to Allege Use in which it claimed first use and first use in commerce on December 8, 2008.

The description of the mark is:

> The mark consists of the color black as applied to a substantial portion of the outside surface of a box which serves as a container or packaging for the goods and in part forms a background to design and literal elements applied thereto. The dotted lines show placement of the mark and form no part of the mark.

> The specimen of use is reproduced below:



Applicant seeks registration on the Principal Register under Trademark Act Section 2(f), 15 U.S.C. § 1052(f).

The examining attorney refused registration on two bases:  the color black (i) is functional as applied to packaging for floral arrangements, pursuant to Trademark Act § 2(e)(5), 15 U.S.C. § 1152(e)(5), and (ii) is ornamental or decorative and would not be perceived as a trademark pursuant to Trademark Act Sections 1, 2 and 45, 15 U.S.C. §§ 1051, 1052 and 1127, and applicant has not established that its proposed mark has acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f).

The appeal has been fully briefed.  We affirm both refusals to register.

## I.   Evidentiary Issue.

We first address applicant's objection on the basis of relevancy to material that the examining attorney introduced which was downloaded from foreign websites. In general, these websites are from foreign florists or floral delivery networks, such as direct.2.florists.com. Evidence from websites located outside the United States may have probative value depending on the circumstances, including whether the consuming public in the United States is likely to have been exposed to the foreign website. See TBMP § 1208.03 (3d ed. rev. 2012), and cases cited therein at note 4.

The examining attorney submitted the website evidence to demonstrate the effect of color in the floral industry, and in particular the meaning of the color black on floral packaging. The Board has frequently taken into consideration – as we do in the present case – the limitations examining attorneys have in developing evidence. See, e.g., *In re Hudson News Co.*, 39 USPQ2d 1915, 1920 n.10 (TTAB 1996), where the Board stated that it takes "a somewhat more permissive stance with respect to the introduction and evaluation of evidence in an *ex parte* proceeding than it does in an *inter partes* proceeding." See also *In re Budge Mfg., Inc.*, 857 F.2d 773, 8 USPQ2d 1259, 1260-61 (Fed. Cir. 1988) ("the PTO has limited facilities for acquiring evidence …."); and *In re Loew's Theatres, Inc.*, 769 F.2d 764, 226 USPQ 865, 868 (Fed. Cir. 1985) (the practicalities of the limited resources available to the PTO are routinely taken into account in reviewing its administrative actions). It seems to us that evidence pertaining to the effect of color in the floral industry, and in particular the meaning of the color black on floral packaging, would be difficult to locate. In addition, applicant had the opportunity to submit evidence to try to rebut

the website evidence. Therefore, we overrule applicant's objection and consider the website evidence.

We have also considered applicant's specific objections to particular website evidence but, with the exception of applicant's objections to pages from the Pianki, Scottsdale Flower Bouquets, and Flower Advisor websites (discussed later in this opinion), they are overruled.

## II.   Functionality.

Section 2(e)(5) of the Trademark Act prohibits registration of a mark if it "comprises any matter that, as a whole, is functional." Our primary reviewing court said in *Valu Engineering Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1428 (Fed. Cir. 2002) (internal citations omitted):

> An important policy underlying the functionality doctrine is the preservation of competition. As this court's predecessor noted in *Morton-Norwich*,[2] the "effect upon competition 'is really the crux'" of the functionality inquiry and, accordingly, the functionality doctrine preserves competition by ensuring competitors "the right to compete effectively."

In *M-5 Steel Mfg. Inc. v. O'Hagin's Inc.*, 61 USPQ2d 1086 (TTAB 2001), a case involving metal roofing tiles and ventilating ducts, the Board set forth a comprehensive review of the case law on functionality in the wake of the Supreme Court's most recent pronouncement on the subject in *TrafFix Devices Inc. v. Marketing Displays Inc.*, 532 U.S. 23, 58 USPQ2d 1001 (2001). The Board recognized that there are two forms of functionality, utilitarian functionality and aesthetic functionality. *M-5 Steel*, 61 USPQ2d at 1096 ("This case seems to involve

---

[2] *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 213 USPQ 9 (CCPA 1982).

elements of both utilitarian and aesthetic functionality. ... [T]here is no question that applicant's roof designs which match the appearance of surrounding roof tiles are more pleasing in appearance because the venting tiles in each case are unobtrusive."). Accord, *Christian Louboutin S.A. v. Yves Saint Laurent America Holdings, Inc.*, 696 F.3d 206, 103 USPQ2d 1937, 1943 (2d Cir. 2012) (there are "two forms of the functionality doctrine [that] are relevant ... 'traditional' or 'utilitarian' functionality, and 'aesthetic' functionality."); *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 213 USPQ 9, 13 n.1 (CCPA 1982). ("It is well known that the law of 'functionality' has been applied in both a 'utilitarian' sense and in terms of 'aesthetics.'").

A. <u>Utilitarian Functionality</u>.

A feature is considered to be "functional" in a utilitarian sense if it is (1) "essential to the use or purpose of the article," or if it (2) "affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982). The Federal Circuit, our primary reviewing court, considers four factors when considering utilitarian functionality. These factors, known as the "*Morton-Norwich*" factors, are: (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product. *Morton-Norwich*, 213 USPQ at 15-16. See also *Valu Engineering* 61 USPQ2d at 1426.

5

B. Aesthetic Functionality.

A feature that is not essential to the use or purpose of the article, or does not affect the cost or quality of the article – in other words, would not be considered as utilitarian functional under the *Inwood* formulation – is still prohibited from registration if the exclusive appropriation of that feature would put competitors at a significant non-reputation related disadvantage. In *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 34 USPQ2d 1161 (1995), which involved the color green-gold for dry cleaning press pads, the Supreme Court addressed the question of protecting a trademark that consists, "purely and simply, of a color," *id.* at 1162, and considered this question under the functionality doctrine of trademark law. The Court stated that "[t]he functionality doctrine thus protects competitors against a disadvantage (unrelated to recognition or reputation) that trademark protection might otherwise impose, namely their inability reasonably to replicate important non-reputation-related product features." *Id.* at 1165.

In order to determine whether a color mark is functional, the Court stated:

The upshot is that, where a color serves a significant non-trademark function – whether to distinguish a heart pill from a digestive medicine or to satisfy the "noble instinct for giving the right touch of beauty to common and necessary things," G.K. Chesterton, Simplicity and Tolstoy 61 (1912) – courts will examine whether its use as a mark would permit one competitor (or a group) to interfere with legitimate (non-trademark-related) competition through actual or potential exclusive use of an important product ingredient.

In the later *TrafFix* decision, the Supreme Court explained:

[A] feature is … functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device. The

> *Qualitex* decision did not purport to displace this traditional rule. Instead, it quoted the rule as *Inwood* had set it forth. It is proper to inquire into a "significant non-reputation-related disadvantage" in cases of aesthetic functionality, the question involved in *Qualitex*.[3] Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature. In *Qualitex*, by contrast, aesthetic functionality was the central question, there having been no indication that the green-gold color of the laundry press pad had any bearing on the use or purpose of the product or its cost or quality.

58 USPQ2d at 1006-7.

The Second Circuit in the recent *Louboutin* case, explained the doctrine of aesthetic functionality in light of the Court's statements in *Qualitex* and *TrafFix*:

> [T]he test for aesthetic functionality is threefold: At the start, we address the two prongs of the *Inwood* test, asking whether the design feature is either "essential to the use or purpose" or "affects the cost or quality" of the product at issue. Next, if necessary, we turn to a third prong, which is the competition inquiry set forth in *Qualitex*. In other words, if a design feature would, from a traditional utilitarian perspective, be considered "essential to the use or purpose" of the article, or to affect its cost or quality, then the design feature is functional under *Inwood* and our inquiry ends. *But if the design feature is not "functional" from a traditional perspective, it must still pass the fact-intensive Qualitex test and be shown not to have a significant effect on competition in order to receive trademark protection.*

103 USPQ2d at 1944 (emphasis added.)

Even prior to these cases, our primary reviewing court had focused on the issue of competitive need in determining whether a particular color can be registered as a trademark. In *Brunswick Corp. v. British Seagull Ltd.* 35 F.3d 1527, 32 USPQ2d

---

[3] The statement that "the question involved in *Qualitex*" was aesthetic functionality has been criticized. See 1 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition,* §§ 7:80, 7:81 (4th ed. 2012), characterizing the statement as "amazing and incomprehensible" dictum, and offering that the very notion of "aesthetic functionality" is an oxymoron. *See also Valu Engineering*, 61 USPQ2d at 1427 n.4.

1120 (Fed. Cir. 1994), *cert. denied*, 514 U.S. 1050 (1995), the applicant sought to register the color black for outboard engines. The Federal Circuit stated that a determination of eligibility for trademark protection depends on a finding of *de jure* functionality based on competitive need. *Id.* at 1122 ("the 'crux' of the distinction between de facto and de jure functionality – determining eligibility for trademark protection or not – is a design's effect on competition. *Morton-Norwich*, 671 F.2d at 1341. Thus, the policies underlying the functional limitation on trademark protection explicitly invoke an inquiry into competitive fairness."). In affirming the Board's finding that the color black is *de jure* functional for outboard motors, the Federal Circuit reasoned:

> The color black, as the Board noted, does not make the engines function better as engines. The paint on the external surface of an engine does not affect its mechanical purpose. Rather, the color black exhibits both color compatibility with a wide variety of boat colors and ability to make objects appear smaller. With these advantages for potential customers, the Board found a competitive need for engine manufacturers to use black on outboard engines. Based on this competitive need, the Board determined that the color was *de jure* functional. This court discerns no error in the Board's legal reasoning and no clear error in its factual findings.

32 USPQ2d at 1122 – 23.

The Federal Circuit also focused on competitive need in *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 52 USPQ2d 1307 (Fed. Cir. 1999), which was decided after *Qualitex* and mentioned by applicant in its reply brief. There, the Federal Circuit reversed a district court's cancellation on summary judgment of a registration for the "Olde Brick" finish of a lighting fixture backplate. Citing *Brunswick* and *Qualitex*, the Federal Circuit found a genuine issue of material fact

as to whether there was a competitive need for others to use the "Olde Brick" finish and remanded "so the district court may make the proper inquiry." *Id.* at 1310. In particular, the Court noted:

> There is evidence that many customers prefer Olde Brick and other composite "rust-type" colors. It is not clear, however, that Olde Brick is one of a few colors that are uniquely superior for use in home decorating. Thus, the district court erred in granting summary judgment that Olde Brick was *de jure* functional.

*Id.*

In *M-5 Steel*, the Board too recognized that aesthetic functionality turns on competitive need, and stated:

> The Federal Circuit has made clear that traditional trademark principles govern the registrability of a proposed mark's aesthetic features. The test for functionality hinges on whether registration of a particular feature hinders competition … .

61 USPQ2d at 1097. The Board ultimately found the aesthetic features of the metal roofing tiles and ventilating ducts involved in that case to be functional because they "blend in or match the roof tiles with which they are used better than alternative products"; and "are compatible with the roof tiles with which they are used and supply applicant with a competitive advantage …. Because applicant's vents match the contours of the roof vents with which they are used, alternatives will not have this advantage." *Id.* at 1097.

C. The Examining Attorney's Refusal.

In the present case, applicant seeks to register a single-color mark, black, for the outside of the box which serves as the container or packaging for its goods. The examining attorney stated that the color black that applicant seeks to register "serves both a utilitarian and an aesthetic function when used for floral packaging."

9

However, the examining attorney then asserted that "[t]he Supreme Court finds appropriate the use of the 'aesthetic functionality' doctrine in cases like this one where color, by its nature, makes it difficult to evaluate the functionality issue from a purely utilitarian standpoint." Brief at pp. 5 and 11. Because the examining attorney approached the refusal under the aesthetic functionality doctrine, on which he relies heavily in his denial of applicant's request for reconsideration and in the majority of his brief, we confine our analysis to that approach. In other words, we treat the examining attorney's comments as a concession that the color is not functional under the *Inwood* formulation and we therefore consider whether there is a competitive necessity for the color. See *TrafFix*, 58 USPQ2d at 1006-7 (where the design is functional under the *Inwood* formulation there is no need to proceed to consider if there is a competitive necessity for the feature, but when the issue is aesthetic functionality, it is proper to inquire into whether there is a significant non-reputation-related disadvantage).

This does not mean that a non-utilitarian positive feature of a product or packaging must always be found to be aesthetically functional; to the contrary, as the Board stated in *M-5 Steel*, "functionality hinges on whether registration of a particular feature hinders competition and not on whether the feature contributes to the product's commercial success." 61 USPQ2d at 1097. See also *Kichler*, 52 USPQ2d at 1310, where the Federal Circuit stated:

> This examination of competitive need "should not discourage firms from creating [a]esthetically pleasing mark designs, for it is open to their competitors to do the same." [*Qualitex*], 514 U.S. 159, 115 S.Ct. 1300; *see also Brunswick*, 35 F.3d at 1533, 32 USPQ2d at 1124 ("[A]esthetic ingredients to commercial success are not necessarily *de*

*jure* functional. … Color compatibility and ability to decrease apparent motor size are not in this case mere aesthetic features. Rather these non-trademark functions supply a competitive advantage."). Mere taste or preference cannot render a color – unless it is "the best, or at least one, of a few superior designs" – *de jure* functional.

As noted, the examining attorney argues that the color black serves an aesthetic function when used for floral packaging. According to him, the flower industry (encompassing both flowers and floral packaging) is an industry in which the use of color is both dynamic and highly significant; floral packaging sends as important a message as the flowers themselves; black, in the context of floral arrangements, is associated with stylish or formal events such as weddings, providing an "elegant," "classical" or "luxurious" look, and in other contexts may connote grief or condolence, and is a critical color in connection with Halloween displays; and there is a strong competitive need for the color black in order to permit the appropriate or desired message to be sent by the consumer to a recipient of flowers. Further, the examining attorney states that when color-use in an industry is prevalent and dynamic, color is likely unregistrable, citing the Board's decision in *Saint-Gobain Corp. v. 3M Co.*, 90 USPQ2d 1425 (TTAB 2007). We therefore determine factually whether registration of the color black for boxes for flowers and live cut floral arrangements serves a non-trademark purpose that would hinder the ability of others to effectively compete with the registrant.

The evidence in the record reflects that, indeed, in the floral industry, color has significance and communicates particular messages. It is commonly known that a dozen red roses are given as a message of love, particularly for Valentine's Day. See

11

also the following regarding the significance of color in connection with the floral industry:

> teleflora.com - "The Color of Flowers!" (August 10, 2011 Office Action at 18) "The flower colors you choose for a bouquet can be as important as the types of flowers used in an arrangement."

> Hubpages website - "The Power of Color: Colors and Their Meanings," (August 10, 2011 Office action at 8) "Colors are connected to … the floral industry and countless other aspects of our lives."

> flowersunlimitedworldwide.com - "Age-old Custom of Conveying Message Still Favoured Today" (August 10, 2011 Office action at 23), "The messages sent with flowers can be a myriad of meanings from empathy to sympathy and from amazement to congratulations to simply, I extend beauty into your life."

The evidence also reflects that the packaging that the flowers are delivered in plays a part in the presentation of the flowers. See:

> blacktable.com - "What They Said in Flowers" (July 29, 2010 Office action at 121), commenting on meaning of a dozen roses given in a white box with a red bow and chocolates ("I really love you.").

> 1-800-GiftBox - (August 10, 2011 Office action at 10) offering black flower boxes with three different finishes so that purchasers can "[s]elect from over 30 colors and designs to make your floral arrangement the perfect gift."

> inbloom.com - (January 31, 2011, applicant's request for reconsideration) "the Do-It-Yourself Kit [pictured below] … is not how we spell Romantic!"



"Sending boxed flowers as a gift? They're NOT going to look like the picture advertised."

hubpages.com - "Beautiful Flowers and Gifts in Miami" (July 29, 2010 Office action at 15), discusses designs by Oscar Maas, including a "masculine black box" containing flowers, a vase and aftershave for $395.00.

http://www.e388.net/55-Color-Meanings-For-Flowers.html - (August 10, 2011 Office action at 59) "Color Meanings For Flowers – News ... It is said that flower types and colors have special meanings. The packaging such as hand-tied bouquets, potted flowers, single flowers, or flower arrangements should also be chosen carefully."

Further, applicant recognizes the significance of packaging in the context of gift-giving; applicant acknowledges "the obvious – namely, that shoddy packaging devalues a gift." Reply at 3.

As for the color black, we agree with the examining attorney that it has particular meaning or significance. Black communicates elegance or luxury. See:

Livingartoriginals.com - (August 10, 2011 Office action at 37) under "Colors Symbolism in North America," "Black and gold indicate luxury while bright, multi-colored packages connote fun, such as snack foods or candy."

HubPages website - "The Power of Color: Colors and Their Meanings" (August 10, 2011 Office action at 8), states "Colors are connected to art, ... fashion, ... the floral industry ... 'Black is the queen of all colors' ... black defines the rest of the color world and acts as a stage for the colors ... black grabs our attention ... black makes us look thinner and even classy."

This meaning or significance extends to floral packaging; the examining attorney's evidence reflects that black communicates "elegant," "classical" or

13

"luxurious" in the context of floral packaging:[4]

> darcys-flowers.com - (July 29, 2010 Office action at 81) shows a "Tiffany" arrangement "Presented in Darcy's classical way in a black box accentuated by gorgeous pink satin ribbon."
>
> flowerangels.com - (July 29, 2010 Office action at 64) offers "Single Red rose in a simple classy box," showing a single rose in a black box.
>
> Victoriaparkflowers.com.nz - (July 29, 2010 Office action at 54) offers "1 Dozen Red Roses presented in a stylish black box … ."
>
> uk.direct2florist.com - (July 29, 2010 Office action at 20, 30, 31 and 46) offers (i) "Single Rose … in a luxury slim-line black box bedded in soft tissue …"; and (b) "A dozen roses … tastefully presented in a decorated black box…." See also direct2florist.com webpage submitted with March 8, 2011 Office action at 62, showing roses in a black box and stating "Quality [r]ed rose inside a luxury box … ."

In addition, the evidence reflects that black has significance on somber occasions such as in the context of death. The article entitled "The Power of Color: Colors and Their Meanings," (HubPages website, August 10, 2011 Office action at 8), states "Black has been … often associated with death." Black is the traditional sign of mourning; it is common knowledge that black clothing is traditionally worn at funerals. Flowers and floral displays play an important role in the context of funerals and mourning; flowers are ubiquitous at funerals and it is also common

---

[4] We give less weight to the examining attorney's evidence from floweradvisor.com/florist/united_states (July 29, 2010 Office action at 60 and 62) involving the PUTTIN' ON A RITZ product in view of applicant's attorney's declaration (submitted with January 31, 2011 request for reconsideration) stating, inter alia, that he conducted a search for this product and "that his search disclosed that this product is no longer offered on the site."

Also, we have not considered the website evidence from (i) scottsdaleflowerbouquets.com (July 29, 2010 Office action at 79), (ii) pianki.com/Ultimate-Rose-Fresh-Long-Stemmed-Red-Roses-with-Black-Vase (July 29, 2010 Office action at 66), and (iii) theultimaterose.com (August 10, 2011 Office action at 80) all of which offer the same product, namely roses from Ultimate Rose (presented in a black box), because applicant, on June 1, 2011, obtained an assignment of any rights, title and interest Ultimate Rose had to the color black as a mark for floral products and services, together with any goodwill of the business.

knowledge that flowers are commonly presented as an expression of condolence. With regard to floral packaging, black is an appropriate color for floral packaging, and is used as floral packaging in bereavement bouquets. See:

> streetdirectory.com/florists/singapore – linked to floweradvisor.com (November 28, 2008 Office action at 31); advertises "Funeral Flowers" with the description: "Pristine sympathy is emoted through this arrangement of white roses which signifies purity, hope and love. A perfect way to send your heartfelt condolences. White Roses With Caspia On A Black Velvet Box With White Lace."

Next, the examining attorney points out that black is also a traditional Halloween color, and is used as a color in Halloween floral bouquets or on containers for Halloween bouquets, relying on the following:

> Teleflora.com Halloween Flowers, (July 29, 2010 Office action at 97) for the "Mostly Ghostly", "Best Witches" and "Cute n' Creepy" bouquets, flowers in yellows and orange in black vases or containers.

> "Spooktacular Spider" (July 29, 2010 Office action at 100) arrangement "adorned with a spider made with a sunflower center, black chenille stems and wiggly eyes, and delivered in a black vase."

When we consider the evidence in the record, we find that the examining attorney has demonstrated *prima facie* that there is a competitive need for others in the industry to use the color black in connection with floral arrangements and flowers. Competitors who, for example, want to offer flowers for bereavement purposes, Halloween or to imbue an element of elegance or luxury to their presentations through packaging therefor will be disadvantaged if they must avoid using the color black in such packaging. As the examining attorney stated, "competitors will need to use black packaging to convey an appropriate message or sentiment, whether that is elegance, style, festivity, grief or sympathy" and

15

"[a]llowing singular entities to control certain colors, in a field where color is both dynamic and has significance, would severely limit the availability of appropriate color choices to consumers seeking [particular] floral arrangement gifts."

To rebut the examining attorney's *prima facie* case, applicant submitted a number of third-party registrations comprising a single color as applied to boxes or containers for a variety of products, including plants, flowers and jewelry, which registered on the Principal Register under Section 2(f) or on the Supplemental Register. Applicant also relies on Registration No. 2184128, for a blue box, registered to Tiffany & Company. These registrations, which are for different colors or different shapes for the same or similar goods (e.g., flowers and plants), or for different goods (e.g., crab meat and jewelry), have extremely limited probative value. Further, it is well-settled that neither the Board nor our primary reviewing court is bound by prior determinations by the Office and each case must be decided on its own merits. See *In re Nett Designs Inc.*, 236 F.3d 1339, 57 USPQ2d 1564 (Fed Cir. 2001). Simply put, the decisions to allow the third-party registrations of record to register do not justify registration of the instant applied-for matter.

In addition, the examples of other floral boxes which applicant maintains are used by its competitors such as 1800Flowers.com and ProFlowers, submitted with its request for reconsideration, are not persuasive; they do not indicate they are for the occasions noted by the examining attorney, or for an appearance of "elegance" or "sophistication." This evidence actually supports the examining attorney's position; it does not refer to the occasions or situations noted by the examining attorney (Halloween, bereavement, elegance, etc.), thereby suggesting that other packaging

16

is appropriate and used for such occasions. Hence, there is an absence of alternative packaging for the situations we have discussed.[5]

Thus, we conclude that applicant has not rebutted the *prima facie* case of functionality established by the examining attorney, and find that the proposed mark is functional under Trademark Act § 2(e)(5).

### III.    Acquired Distinctiveness

As noted at the beginning of this decision, the examining attorney issued an alternative refusal on the ground that the proposed mark would not be perceived as a trademark. Applicant responded that the proposed mark has acquired distinctiveness and is registrable under the provisions of Section 2(f) of the Trademark Act.[6] Even though our finding of functionality precludes registration, we consider the question of acquired distinctiveness to render a full decision on the issues presented in this appeal.

---

[5] We note that the absence of alternatives is one of the four factors identified in *Morton-Norwich, supra,* for determining functionality, i.e., whether alternative designs are available that serve the same utilitarian purpose. Our approach in considering the effect on competition is consistent with this factor. Accord, *Brunswick,* 32 USPQ2d at 1123 ("In evaluating competitive need, the Board correctly stated:

> [W]hen we consider whether a color is functional we must consider whether alternative colors are available in order to avoid the fettering of competition. If competition will be hindered, the color in question is de jure functional.

*British Seagull*, 28 USPQ2d at 1199. This approach harmonizes with *Morton-Norwich*:

> Since the effect upon competition "is really the crux of the matter," it is, of course, significant that there are other alternatives available.

*Morton-Norwich*, 671 F.2d at 1341 (citation omitted).").

[6] Although packaging trade dress may be inherently distinctive, color never can be. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 54 USPQ2d 1065, 1068 (2000); *see also Qualitex*, 34 USPQ2d at 1162-63.

In order to obtain a registration under the provisions of Section 2(f), applicant has the burden of demonstrating that its mark has acquired distinctiveness. See *Yamaha Intern. Corp. v. Hoshino Gakki Co., Ltd.*, 840 F.2d 1572, 6 USPQ2d 1001 (Fed. Cir. 1988). "The kind and amount of evidence necessary to establish that a mark has acquired distinctiveness in relation to goods or services depends on the nature of the mark and the circumstances surrounding the use of the mark in each case." *In re Chevron Intellectual Property Group LLC*, 96 USPQ2d 2026, 2030 (TTAB 2010), citing *Yamaha,* 6 USPQ2d at 1008 (where the product design sought to be registered is common or ornamental, applicant has an "unusually heavy burden" to show acquired distinctiveness). "By their nature color marks carry a difficult burden in demonstrating distinctiveness and trademark character." *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 424 (Fed. Cir. 1985). Accordingly, applicant bears a heavy burden in this case to establish that the applied-for matter has acquired distinctiveness and is perceived as a trademark for its goods. We turn then to the evidence submitted by applicant.

Applicant submitted the declaration of Larry Plawsky,[7] applicant's Senior Vice President, Marketing, dated January 23, 2011. He states in relevant part:

> Applicant used its black box mark substantially exclusively and continuously in commerce for at least two years;

> Applicant sold in excess of 1.8 million units of "the Goods" under the mark in the United States since December 2008;

---

[7] Applicant also submitted the declaration of Jon Burney, applicant's Executive Vice President, General Counsel and Secretary, dated December 15, 2009. It essentially discusses the same material as discussed in Mr. Plawsky's declaration, but was made a year earlier and hence sets forth smaller figures. We therefore discuss Mr. Plawsky's later declaration, but we have also considered Mr. Burney's declaration.

Applicant prominently promoted the black box mark on its website (reproduced in pertinent part below) for "at least the past 24 months" in which time the website has had in excess of 350 million page views and 35 million unique visits;

Applicant prominently promoted the mark in its mailers;

In July 2010, applicant began advising consumers to "[l]ook for the black box as a symbol of high quality FTD flowers," in its website (see below) and "other marketing materials"; and

Applicant alleges "unique web visits" to the FTD website in excess of nine million during that period.

Mr. Plawsky included the following image from applicant's website:[8]



We accord the declaration limited weight. First, the black boxes depicted in the mailer and web pages include designs and wording, providing other matter which the consumer may look to for an indication of the source of the goods. Thus, if applicant has "prominently promoted the black box," it appears that it has done this with other matter on the box. Second, applicant used the "look for" statements for a short period of time, only for one year prior to Mr. Plawsky's declaration. Third, applicant does not indicate how many mailers it distributed. Fourth, it appears that those unique visitors in the period from July 2009 to July 2010 numbering

---

[8] The line around the "Look for" language appears to have been added by Mr. Plawsky or applicant's attorney.

twenty-six million did not have the benefit of the "look for" statement because applicant placed the "look for" statement on applicant's Internet site in July 2010.

In addition, applicant submitted four "Statement[s] of Consumer[s]" that state in relevant part that they "have come to recognize the color black on packaging as identifying FTD's flowers and floral arrangements, and as distinguishing them from competitors' goods." Request for reconsideration of January 31, 2011 at 54 – 58.

We have some problems with the probative value of these declarations, which are essentially identical.[9] First, they do not account for the other matter that appears on the boxes, as shown in the above reproductions of the specimen and applicant's web page. Second, there is no indication where the individuals who signed the declarations reside, hence raising the possibility that they are not representative of some geographic diversity. Third, and most importantly, four statements are a very small number given the nature of the proposed mark, and they are simply insufficient to be probative of the issue of acquired distinctiveness.

Thus, in light of applicant's "unusually high burden" to demonstrate that its proposed mark has acquired distinctiveness, *Owens-Corning Fiberglas,* 227 USPQ at 424, we find that applicant has not demonstrated that its proposed mark has acquired distinctiveness.

---

[9] Form statements may be used to show acquired distinctiveness. *In re Lorillard Licensing Co.*, 99 USPQ2d 1312 (TTAB 2011). However, the fact that they are form statements, weighed together with the other shortcomings identified above, does lessen the probative value of the statements. *See, e.g., In re Pacer Tech.*, 338 F.3d 1348, 67 USPQ2d 1629, 1633 (Fed. Cir. 2003) (Where multiple affidavits are "nearly identical," "conclusorily worded," "fail to explain what it is about Pacer's adhesive container cap that is unique or unusual, or distinctive," and "represent the views of a small segment of the relevant market," "they are not the kind of 'competent evidence' that could carry Pacer's burden of rebutting the PTO's prima facie case.") (citation and internal quotation marks omitted).

**Decision:** The refusals to register on the basis of functionality and failure to establish acquired distinctiveness are affirmed.[10]

**Opinion by Bucher, Administrative Trademark Judge, concurring:**

It is sometimes difficult to follow and reconcile the various threads of case law patiently laid out by the majority (II.A. and II.B, at 5 – 9, *supra*). While I agree whole-heartedly with the results of the majority, I have decided to issue a short concurring opinion of my views on evaluating this fact pattern – even at the risk of over-simplifying this difficult area of the law.

II.A. and II.B.  Functionality – the law

There are two distinct challenges with evaluating the registrability of putative marks involving non-traditional types of indicators: (1) the infinite variety of non-literal features merchants and manufacturers may choose to claim as source indicators; and (2) the penchant of any tribunal to choose a cubby hole for analysis, and shove each new case into the most recent, handy compartment seemingly countenanced by a higher court for similar fact patterns.

With these challenges, tribunals are sometimes wont to apply constricting (and often misleading) labels. This, in turn, has led to inevitable confusion in legal

---

[10] In its second and final request for reconsideration, applicant requested, for the first time, that if it is ultimately determined that it has not established acquired distinctiveness of its proposed mark, that its proposed mark be registered on the Supplemental Register.  In his denial of that request, the examining attorney stated that the refusal under Section 2(e)(5) precludes registration on the Supplemental Register.  Because we have affirmed the refusal on the basis of functionality, applicant's request, in the alternative, to seek registration on the Supplemental Register is denied.

analysis -- in the courts,[11] in some commentaries, as well as in *ex parte* prosecution practices. Hence, my preference is for a clear-eyed analysis that begins each new case with "first principles" drawn from our magnificent trademark jurisprudence.

As with arguable generic terms, when one is faced with a putative source-indicator such as the configuration of a product or its packaging or any product feature that enhances the attractiveness of the product, it is logical to ask as a first question whether the public interest is best served by refusing to permit a particular feature to be taken from the "public domain." This is, at its root, a public policy question, and turns on whether the non-traditional indicator should remain permanently available for competitors to use freely.[12] If one sifts through the relevant case law, it is clear that the best enunciation of this standard is one focused on whether competitors can still compete effectively, or contrariwise, whether they will suffer a significant non-reputational disadvantage.[13]

---

[11] Perhaps in no case is this more regrettable than the decades of confusion spawned by the Ninth Circuit formulation tying the bar of "aesthetic functionality" to any feature that proves to be "an important ingredient in the commercial success of the product." *Pagliero et al. v. Wallace China Company, Limited,* 198 F.2d 339, 95 USPQ 45, 48 (9th Cir. 1952).

[12] *In re DC Comics, Inc.*, 689 F.2d 1042, 215 USPQ 394, 402 (1982) (J. Nies, concurring).

[13] *See, e.g.*, the following full citations to legal guidance, listed in chronological order: *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 213 USPQ 9 (CCPA 1982); *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 214 USPQ 1, 9 (1982) (J. White, concurring); *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 424 (Fed. Cir. 1985); *Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1531, 1533, 32 USPQ2d 1120, 1122, 1124 (Fed. Cir. 1994), *cert. denied*, 514 U.S. 1050 (1995); *Qualitex Co. v. Jacobson Prods. Co.*, 512 U.S. 159, 34 USPQ2d 1161 (1995); Trademark Act § 2(e)(5), 15 U.S.C. § 1052, Pub. L. 105-330, Sec. 201(a)(2), effective Oct. 30, 1998; *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 52 USPQ2d 1307 (Fed. Cir. 1999); *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 58 USPQ2d 1001, 1006 (2001); *M-5 Steel Mfg. Inc. v. O'Hagin's Inc.*, 61 USPQ2d 1086 (TTAB 2001); and *Valu Engineering Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1428 (Fed. Cir. 2002).

In this context, the Supreme Court in the *TrafFix* decision (58 USPQ2d at 1006) criticized the appeals court for placing too great a burden on the copyist. While any reputation-based feature is entitled to operate as a valuable asset of the innovator, the copyist as the opposing party (or in an *ex parte* refusal, the examining attorney) in turn needs to show that protection of the proposed trade identifier would create a "significant disadvantage" for competitors – but not the higher standard stated by the Sixth Circuit in their *TrafFix* opinion, the more difficult showing of "competitive necessity." *Id*.

In case of configurations, the largely mechanical factors enunciated in *Morton-Norwich* (213 USPQ at 15-16) work well to make the correct factual determination as to whether the innovator's competitors can still compete effectively. However, as seen in *Owens-Corning*, *Brunswick*, and *Qualitex*, when it comes to making determinations in overall-color cases, applying factors that were derived in the context of designs of three-dimensional products has us repeatedly forcing a square peg into a round hole. Nonetheless, in every case, the first principles remain the same. Especially when confronting product features that enhance the attractiveness of the product (e.g., trade dress, surface design and overall color), being forced in advance to choose a label ("utilitarian functionality," "aesthetic functionality," "ornamentation," etc.), presents the possible peril of stumbling badly over first principles.

With this approach, the fact-finder will need to determine in each case whether "aesthetic features" run afoul of Trademark Act § 2(e)(5). If one returns to basic principles, it seems we do not need to join in the ongoing debate among the

circuit courts of appeal as to whether the tortured concept of "aesthetic functionality" has morphed far enough from *Pagliero* to retain some viability.

With this as a backdrop, I identify myself with the factual discussions as set out in the majority opinion at II.C., *supra*, especially at 11 – 17.

III. Acquired Distinctiveness

As to the majority's discussion of acquired distinctiveness (III. Acquired Distinctiveness (at 17-21)), I also agree with the majority opinion, but continue with a discussion flowing logically from Sections II.A. and II.B. of my concurrence above.

Provided that the question of whether others in the field can compete effectively is decided in favor of the innovator, there is still the question of whether potential consumers have been conditioned to recognize the claimed feature as indicating a single source. Under the principle of deferred recognition,[14] the focus turns to whether the innovator has been successful in creating acquired distinctiveness on the part of consumers in the relevant marketplace. Again, this is a fact-intensive inquiry, but no longer focuses on the interests of competitors, but rather whether permitting encroachment on this (arguably) reputation-based feature that the public may well have come to associate with a single source will be subject to source confusion – a significant reason to provide protection for any distinctive mark.

Finally, I note with satisfaction that the latest draft of the TMEP, at § 1202.02(a)(vi), is totally consistent with the simplified, bifurcated approach I have reiterated herein in at least two significant respects. First, irrespective of whether

---

[14] *DC Comics*, 215 USPQ at 402 (J. Nies, concurring).

this Board should decide at some future point to drive a stake through the heart of the "aesthetic functionality" doctrine, I agree that "[g]enerally speaking, examining attorneys should exercise caution in the use of the term 'aesthetic functionality,' in light of the confusion that historically has surrounded this issue." Second, in cases involving product features that enhance the attractiveness of the product when one might be inclined to evaluate the feature under the rubric of "ornamentation," it is entirely appropriate to follow the same two steps outlined herein. If the first issue is capability, the underlying analysis is similar to genericness/functionality, while the refusal may be grounded in the combination of §§ 1, 2 and 45. On the other hand, if the question is no longer effective competition (or the case is being argued in the alternative), and the issue is now whether consumers will recognize the feature as a source indicator, the analysis takes place under the rubric of § 2(f).